# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK MIKHLIN, JEFFREY OLSTER, and ROSALIND SCHOOF, Individually and on behalf of all others similarly situated,<br><br>                           Plaintiff,<br><br>   v.<br><br>OASMIA PHARMACEUTICAL AB, JULIAN ALEKSOV, MIKAEL ASP, ANDERS LUNDIN, FREDRIK GYNNERSTEDT, ANDERS BLOM, BO CEDERSTRAND, ALEXANDER KOTSINAS, LARS BERGKVIST, PER LANGÖ, HANS LILJEBLAD, HORST DOMDEY, and ERNST & YOUNG AB,<br><br>                           Defendants. | Case No:   1:19-cv-04349-NGG-RER<br><br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ................................................................5

III.   PARTIES ...................................................................................................5

IV.    THIRD PARTIES .....................................................................................8

V.     DEFENDANTS' FRAUDULENT ACTS ................................................9

     A.   Defendants Misstate Oasmia's Financial Statements By Making
          Monthly Undisclosed 0% Off-The-Books Loans To Themselves........10

          1.   Defendants use related-party loans to skim Oasmia's
               interest income .........................................................................10

          2.   Aleksov and Cederstrand's Off-The-Books Transactions
               Make Oasmia's Disclosures Misleading.....................................11

     B.   Defendants Falsely Report Additional Compensation Paid To
          Aleksov and Cederstrand As a Related-Party Transaction ...................15

          1.   Ardenia Sells To Oasmia Patent Rights Oasmia Already
               Owns .........................................................................................15

          2.   Disclosing the Acquisition of the Patent Rights From
               Ardenia As A Related-Party Transactions Understated
               Aleksov and Cederstrand's Compensation ................................17

     C.   Oasmia Recognizes A Credit Commitment From Alceco Which
          Alceco Has No Capacity To Pay ...........................................................19

          1.   Alceco Is Hit with An Arbitral Award It Cannot Pay...............19

          2.   Defendants Misleadingly Claim That Oasmia Has Access
               to the Credit Commitment. ........................................................20

     D.   Oasmia Misstates the Terms of Convertible Bonds By Labelling
          The Transactions As Completed Though Aleksov and Cederstrand
          Would Only Pay the Agreed-Upon Consideration If and When the
          Bonds Were In the Money .....................................................................21

          1.   Oasmia Issues Convertible Bonds But Does Not Collect
               Payment....................................................................................21

2.  Aleksov and Cederstrand's Convertible Bond Purchases Were Awards of Warrants and Had To Be Disclosed As Such....................................................................................23

E.   Defendants Falsely State That Oasmia Is Ready To Spin Off Its Veterinary Medical Assets ...................................................................24

VI.   E&Y FRAUDULENTLY CERTIFIED THAT OASMIA'S FINANCIAL STATEMENTS WERE ACCURATE.................................................................25

A.   E&Y Misleadingly Told Investors That Oasmia's Financial Statements Were Presented In Accordance With IFRS, That E&Y's Audits Had Followed PCAOB Standards, And That E&Y Had Taken Internal Control Deficiencies Into Account In Planning Its Audits ........................................................................25

B.   E&Y Violated PCAOB Standards In Failing to Detect Aleksov's Skimming Oasmia's Interest ...............................................................27

C.   E&Y Violated PCAOB Standards By Failing To Determine that Oasmia Did Not Receive Payments For Convertible Bond Sales ........................30

D.   E&Y Violated PCAOB Standards By Failing To Identify Fraud In The "Purchase" Of The XR17 Extension .............................................30

E.   E&Y Violated Auditing Standards By Failing To Examine Whether Alceco Could Fund The SEK 40 Million Credit Line ..........................33

F.   Additional Red Flags ........................................................................35

VII.   THE TRUTH CONCEALED BY DEFENDANTS' FALSE STATEMENTS CAUSES OASMIA'S CATASTROPHIC LOSSES .............................37

A.   A Competent Director Resigns Upon Discovering Defendants' Fraud ...................................................................................37

B.   Aleksov and Cederstrand Attempt to Retire a Crippling Loan .............................39

C.   Aleksov And Cederstrand Seize the Opportunity To Profit From An Unexpected Increase in Oasmia's Stock Price .................................40

D.   Oasmia Opposes Arwidsro's Proxy Campaign.....................................................41

E.   Oasmia And Its Advisors Conclude That Oasmia Had Committed Fraud. .......................................................................................45

VIII.   ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER .............................47

A.   Additional Thefts ........................................................................47

B.    Oasmia's Board Minutes Show the Board Rubberstamped Aleksov and Cederstrand's Decisions ................................................................. 48

IX.    DEFENDANTS' FALSE STATEMENTS ........................................................ 49

X.    PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................ 88

**COUNT I FOR VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 PROMULGATED THEREUNDER <u>AGAINST ALL DEFENDANTS</u>** .................... 91

**COUNT II VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT <u>AGAINST THE INDIVIDUAL DEFENDANTS</u>** ........................................ 93

XI.    PRAYER FOR RELIEF ................................................................................. 97

XII.    JURY TRIAL DEMANDED .......................................................................... 97

Lead Plaintiffs Mark Mikhlin, Jeffrey Oster, and Rosalind Schoof ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Oasmia's public filings with the SEC; (ii) research reports from securities and financial analysts ; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Oasmia securities; (vii) consultation with experts; (viii) investigative reports and findings from third party accounting firms; and (ix) additional materials and data concerning the Company and industry as identified herein.

## I. NATURE OF THE ACTION

1. This is a securities class action on behalf of persons or entities who purchased or otherwise acquired publicly traded the American Depositary Shares ("ADSs") of Oasmia Pharmaceutical AB from October 23, 2015 through October 14, 2019, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Oasmia, a Swedish development-stage biotechnology company, shouted to investors throughout the Class Period in its annual reports, its quarterly reports, and its current reports, that it had disclosed all related-party transactions and deficiencies in its internal controls, that it had regularly sold convertible bonds in above-board transactions, and that it had access to a credit line from Julian Aleksov, Oasmia's CEO, and Bo Cederstrand, Aleksov's relative.  In truth, aided by a compliant and reckless board, Aleksov and Cederstrand had ravaged Oasmia since at least 2008 through undisclosed off-the-books related party transactions and outright theft

that made all these statements misleading. When a large investor sought to replace Oasmia's compliant board, Oasmia's then-board fought a protracted proxy battle. The facts revealed in this proxy battle caused Oasmia's stock price to fall, but Oasmia's then-board ultimately lost the battle. New management discovered and announced old management's wrongdoing, causing further stock prices. Aided by a report commissioned by a Big 4 Audit Firm, new management then concluded and announced that old management had defrauded investors and the public markets for the entirety of the Class Period. Class Members are the investors Oasmia has admitted it defrauded.

3.      Oasmia operates through patented technology it obtained in 2001 from Aleksov and Cederstrand's investment vehicle. To fund its operations, Oasmia both keeps a large amount of cash on hand and regularly raises capital by issuing convertible bonds.

4.      Aleksov and Cederstrand, business partners and relatives, used these features to loot Oasmia, with assistance from a compliant Board of Directors. Since at least 2008, Aleksov and Cederstrand lent themselves a large portion of Oasmia's cash a few days after the beginning of the month and returned the cash a few days before the end of the month – ***every single month***. They thereby skimmed the SEK 2.7 million[1] in interest Oasmia would have earned from that cash. These illegal related-party loans were not disclosed in any of Oasmia's filings, nor even in its financial records. The financial statements were thus misleading, as was Defendants' disclosure that they had reported all fraud to Oasmia's audit committee.

5.      But Aleksov and Cederstrand's routine thefts became much more brazen after November 2016, when they were hit with a massive arbitral award they could not afford to pay.

---

[1] SEK are Swedish Krona, Sweden's currency. During the Class Period, the exchange rate was between 8.6 and 9.6 SEK for every U.S. dollar.

6.      Aleksov and Cederstrand used Oasmia's board's reckless inattention to Oasmia's affairs to secure cash from Oasmia. In one striking case, in November 2017, they forced the Board to approve a resolution to buy a patent extension from them for more than 10.5 million SEK while claiming in Board minutes that they had recused themselves from the decision. In fact, the patent extension was worthless to Oasmia because Oasmia already owned it.

7.      Aleksov and Cederstrand also used Oasmia's convertible bond offerings to enrich themselves.  Beginning in 2016, they and other select investors subscribed to convertible bonds that could profitably be converted into shares if Oasmia's share price increased. But unbeknownst to ordinary investors, they and the select investors did not pay for their bonds unless and until Oasmia's share price increased to a level where the transaction was profitable. In economic substance, Aleksov and Cederstrand turned what was intended to be a risky investment – and was priced accordingly – into an undisclosed award of warrants to buy Oasmia's shares.

8.      In late 2017, Oasmia entered into an agreement with one of its largest investors, Arwidsro Investment AB, as well as MGC Capital Ltd., a company secretly owned by Aleksov's brother. The consideration offered to Arwidsro and MGC for performance was warrants to buy Oasmia stock. When Oasmia's stock price spiked, Aleksov and Cederstrand took the opportunity for themselves by cutting out Arwidsro. Arwidsro, aggrieved, launched a proxy contest to replace Oasmia's board.

9.      With a decade's worth of fraudulent transactions to conceal, Oasmia's existing board bitterly opposed the proxy contest. Oasmia first unlawfully cancelled a legally-mandated shareholders' meeting to decide on the proxy election mere days before it was to take place, causing the price of Oasmia's ADSs to fall. Oasmia then warned, darkly and untruthfully, that electing the new Board would risk Oasmia's listing, causing the price of Oasmia's ADSs to fall

both upon the warnings and when the new board was elected. Aleksov and Cederstrand then sold 45% of their substantial position in Oasmia's stock, causing the price of Oasmia's ADSs to fall upon disclosure of the sale.

10.     Upon appointment, Oasmia's new board launched an investigation of previous misconduct. The price of Oasmia's ADSs fell when the new board announced three months later that it had discovered that Aleksov had engaged in suspicious transactions and reported him to the police – and fell again when two weeks later Oasmia announced that it had severed its connection with Aleksov and appointed a special examiner to investigate his misconduct.

11.     In the aftermath of the disclosures, the Company, though its new board, has acknowledged and made admissions regarding the fraudulent actions of Defendants. In particular, following an investigation, on June 28, 2019, Oasmia described the uncovered transactions as "suspicious" and "remarkable," and confirmed that the transactions were indeed made off-the-books.

12.     The new board appointed a Special Examiner, Deloitte AB ("Deloitte"), who conducted the investigation. Deloitte produced a report in September 2018, whose findings included that the previous board "acted carelessly with respect to a number of decisions or measures," that "[i]t is likely that damage has occurred or may occur in the future as a direct and predictable consequence of these decisions or measures," and that the former board "may have been guilty of violations of both the Swedish Companies Act ('ABL') and criminal law." Deloitte further recommended "that each of the former Board members should be denied discharge of liability at the annual general meeting" in order to enable Oasmia's claim for damages against the responsible Board members. Oasmia then followed Deloitte's recommendations.

13.     By this action, Lead Plaintiffs seek redress for losses resulting from the wrongs Oasmia admits it and its previous management committed.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into and subsequent damages were suffered in this judicial district.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## III.   PARTIES

18.     Plaintiffs, as set forth in their certifications which were previously filed and are incorporated by reference herein, purchased Oasmia securities during the Class Period and were economically damaged thereby.

19.     Defendant Oasmia is a pharmaceutical company focused on treatments within human and animal oncology. Oasmia is incorporated in Sweden and its principal executive offices are located at Vallongatan 1 SE-752 28 Uppsala, Sweden. The Company's American Depository Shares ("ADSs") traded on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol

- 5 -

"OASM" between October 23, 2015 and August 23, 2019. Oasmia's common shares ("Ordinary Shares") have traded on the Stockholm Stock Exchange since 2012.

20.     Defendant Julian Aleksov co-founded Oasmia and served as its Chief Executive Officer until May 2015, when he was appointed as Executive Chairman of Oasmia's Board. Aleksov was also an Oasmia director from 1998 through March 19, 2019. Defendant Aleksov also signed a Sarbanes-Oxley Act of 2002 ("SOX") certification attached to the Company's 20-F for the fiscal year ended April 30, 2016 that described him as the Company's CFO.  Oasmia replaced Aleksov in March 2019 and then ended its relationship in July 2019 because it discovered that Aleksov had fraudulently looted Oasmia in various undisclosed schemes.

21.     Defendant Mikael Asp was Oasmia's CEO between May 2015 and July 1, 2019. During this time, Asp sat on Oasmia's Board.  Before he was elevated to the CEO position, Asp served as Oasmia's Head of Quality Assurance, a non-executive position. On July 1, 2019, Asp was demoted to be Oasmia's Chief Technical Officer, a newly-created position.

22.     Defendant Anders Lundin was the Company's CFO at the time the Company's ADSs began trading on the Nasdaq and served in that position until March 31, 2016.

23.     Defendant Fredrik Gynnerstedt joined the Company as CFO in November 2016 and served in that position until October 2017. Gynnerstedt holds an MBA from Stockholm University.

24.     Defendant Anders Blom served as Oasmia's Executive Vice President between September 2014 and October 2017, and its CFO between October 2017 and March 26, 2019. Before he joined Oasmia, Blom served as the CEO of Oasmia's lender, Nexttobe AB.

- 6 -

25.    Defendant Bo Cederstrand co-founded Oasmia and was a director from 2000 through March 19, 2019, and the Chairman of its Board from 2000 to 2011. Cederstrand is Aleksov's former father in law and the grandfather of two of Aleksov's children.

26.    Defendant Alexander Kotsinas served on Oasmia's Board of Directors from September 2013 through March 19, 2019. Kotsinas was a Partner of Nexttobe from 2011 to 2016 and an independent consultant to it from 2016 to 2017.

27.    Defendant Lars Bergkvist served on Oasmia's Board of Directors from May 2015 through March 19, 2019. Bergkvist holds a degree in Accounting and Finance from Stockholm's School of Economics.

28.    Defendant Per Langö served on Oasmia's Board of Directors from September 2017 through March 19, 2019.

29.    Defendant Hans Liljeblad served on Oasmia's Board of Directors from May 2015 through September 2016. Liljeblad holds a law degree from the University of Stockholm and a law degree from New York University School of Law.

30.    Defendant Horst Domdey served on Oasmia's Board of Directors from 2011 through November 2016.

31.    Defendants Aleksov, Asp, Lundin, Gynnerstedt, Blom, Cederstrand, Kotsinas, Bergkvist, Langö, Liljeblad, and Domdey are the "Individual Defendants."

32.    Oasmia is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Oasmia under *respondeat superior* and agency principles.

- 7 -

34.     Ernst & Young AB ("E&Y") served as Oasmia's registered independent auditor for the entire Class Period.

35.     Defendants Oasmia, E&Y, and the Individual Defendants are the "Defendants."

### IV.     THIRD PARTIES

36.     Anders Lönners became the Chair of Oasmia's Board when Oasmia acquired an asset from Lönners's company, Karo Pharma, in October 2016.  At the time of the acquisition, Aleksov was quoted as saying that "[a] prerequisite in this transaction from our side has been to get access to Anders Lönners['s] unique track record in developing companies and his international business experience." Four months later, Lönners left Oasmia on acrimonious terms.

37.     Alceco is an investment company held by Aleksov (75%) and Cederstrand (25%) at all relevant times. During the entire Class Period, Alceco's only asset was Oasmia stock.

38.     Ardenia is an investment entity which is registered as the applicant and holder of the patents that form the basis for Oasmia's business. Aleksov and Cederstrand each own 50% of Ardenia's shares.

39.     Arwidsro is an investment company and the Company's largest shareholder.

40.     MGC is a thinly-capitalized company secretly owned by Aleksov's brother, Marin Aleksov. Julian Aleksov sits on MGC's board.

41.     Nexttobe AB is an investment firm. Initially Oasmia's lender, Nexttobe converted a portion of its loan into Oasmia's shares, thereby becoming one of its largest shareholders.

42.     Deloitte AB is a Swedish accounting firm. In June 2019, Oasmia retained Deloitte to investigate the misconduct complained of in this Complaint. Deloitte produced a report dated September 18, 2019 ("Deloitte Report"). A translation of the Deloitte Report is attached hereto as Exhibit 1 and incorporated by reference.

- 8 -

## V. DEFENDANTS' FRAUDULENT ACTS

43.     Beginning May 1, 2008, at the latest Aleksov and Cederstrand, have engaged in a host of transactions designed to steal Oasmia's assets. These transactions included off-the-books transfers of a significant portion of Oasmia's cash to Alceco to skim interest income and Oasmia's purchase from Ardenia of patent rights it already owned. Defendants also caused Oasmia to issue bonds convertible into Ordinary Shares to investors – including Defendants – that the investors only paid for if and when the market price of the Ordinary Shares was substantially greater than the bonds' exercise price (i.e., they were in the money). By waiting until the convertible bonds were in the money and immediately reselling the shares they purchased, Defendants could guarantee a profit.

44.     To entice investors, Defendants also asserted that Oasmia had a credit commitment from Alceco which Alceco had no capacity to supply.

45.     These false statements left Oasmia's financial statements and other SEC filings riddled with fraud. The off-the-book transfers to a company owned by Defendants' management had to be disclosed as related party transactions and are, moreover, illegal under both Swedish and U.S. law. Though Oasmia did disclose that it had purchased patent rights from Ardenia, it never disclosed that it was purchasing something it already owned, and thus that the transfer was instead additional compensation to Aleksov and Cederstrand. The disclosure of a credit commitment from Alceco, which was misleading without additional disclosure that Alceco had no funds to honor its commitment, fooled investors into thinking Oasmia had far more liquidity than it truly had. And whenever Oasmia disclosed a convertible bond offering, it stated that the transaction had already happened – though in truth, the transaction would only close if and when the convertible bonds were in the money.

- 9 -

46.    Oasmia engaged in the transactions that rendered its financial statements misleading since before its IPO. *Every* registration statement, *every* annual report, and *every* quarterly report Oasmia filed while it was in the U.S. was materially false or misleading in many different respects. Oasmia made false statements *every time* it disclosed a convertible bond offering. Oasmia was a vessel of outright fraud on the day it reached the shores of U.S. capital markets and remained a vessel of outright fraud on the day it lifted sail to leave.

**A.    Defendants Misstate Oasmia's Financial Statements By Making Monthly Undisclosed 0% Off-The-Books Loans To Themselves**

**1.    Defendants use related-party loans to skim Oasmia's interest income**

47.    From the beginning of 2015 through to the end of 2017, Aleksov and Cederstrand skimmed the income Oasmia earned through interest on its cash reserves.

48.    Within a day or two of the beginning of each month, Aleksov and Cederstrand transferred a significant portion of Oasmia's cash reserves to an account belonging to Alceco ("Cash Sweeps").

49.    Then, a day or two before the end of each month, Aleksov and Cederstrand caused Alceco to transfer the exact same amount back to Oasmia.

50.    As a result, Oasmia's monthly bank statements showed that Oasmia had the same amount of money at the end of the month as they had at the beginning of the month. The bank statements, however, did not show that Oasmia had earned interest.

51.    The transfers were not recorded in Oasmia's financial records.

52.    The transfers amounted to as much as SEK 19.2 million.

53.    The transfers were made through a bank card reader belonging to Aleksov.

54.    When Alceco held Oasmia's cash, it received interest on that cash.

- 10 -

55.     The Deloitte Report estimated that with an estimated interest rate of 8%, Alceco earned interest income of SEK 2.7 million that belonged to Oasmia. These figures imply that Aleksov and Cederstrand withdrew about SEK 11.3 million from Oasmia on average every month.

56.     The Swedish Tax Agency began an audit of Oasmia's tax filings for the periods of May 1, 2008 through April 30, 2013 in 2014. The audit concluded in 2016. The tax auditors identified and asked questions about Oasmia's roughly one hundred Cash Sweeps. In each of these Cash Sweeps, Oasmia lent Alceco money at the beginning of the month and Alceco returned the exact same amount of money at the end of the month. None of the Cash Sweeps identified in the tax audit were recorded in Oasmia's financial statements.

**2.      Aleksov and Cederstrand's Off-The-Books Transactions Make Oasmia's Disclosures Misleading**

57.     SEC Regulation S-K (27 CFR § 229.10) requires that annual reports such as those filed by Oasmia on Form 20-F comply with the other requirements of Regulation S-K "to the extent provided in the forms and rules under [the Exchange] Act."

58.     Under Item 7.B., Form 20-F requires disclosure of transactions with related parties, including "enterprises in which a substantial interest in the voting power is owned, directly or indirectly" by, among others, key management like Aleksov and Cederstrand.

59.     Under SEC regulations, Oasmia must disclose

> The nature and extent of any transactions or presently proposed transactions which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services, or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party.

> The amount of outstanding loans (including guarantees of any kind) made by the company, its parent or any of its subsidiaries to or for the benefit of any of the persons listed above. The information given should include the largest amount outstanding during the period covered, the amount

outstanding as of the latest practicable date, the nature of the loan and the transaction in which it was incurred, and the interest rate on the loan.

Form 20-F, Item 7.B 1.

60.     All financial statements filed during the Class Period violated the securities laws because they misleadingly omitted to disclose (a) all Cash Sweeps as related party transactions, as well as (b) the nature and extent of all Cash Sweeps (monthly loans of up to 19.2 million SEK), (c) the largest amount outstanding during any reference period (up to 19.2 million SEK), (d) the nature of the loan (that they were Cash Sweeps), and (d) the interest rate on the loan (0%).

61.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

62.     Defendants represented that Oasmia's statements were prepared in accordance with International Financial Reporting Standards ("IFRS").

63.     IFRS's International Accounting Standards ("IAS") 24 define "related parties" to include the members of a reporting entity's key management. IAS 24 9.(a)(iii). Key management personnel include all directors. IAS 24 9.

64.     IFRS require disclosure of related party status, IAS 24 14, and, if there are related party transactions during the reporting period, "the nature of the related party relationship as well as information about those transactions and outstanding balances, including commitments, necessary for users to understand the potential effect of the relationship on the financial statements." IAS 24 18.

65.     All financial statements filed during the Class Period violated the securities laws because they misleadingly omitted to disclose (a) all Cash Sweeps as related party transactions,

- 12 -

as well as (b) information about those transactions, namely that they were monthly transactions of up to 19.2 million SEK at a 0% interest rate.

66.     The Swedish tax agency determined in its 2014-2016 tax audit that Oasmia had violated the Swedish Accounting Act. Yet the tax audit was never disclosed in any of Oasmia's annual or quarterly reports.

67.     Both Swedish and U.S. law prohibit public companies from extending loans to their officers or companies they beneficially own. SOX prohibits "any issuer" – meaning any company whose equity securities trade on a U.S. exchange – from "extend[ing] or maintain[ing] credit [] in the form of a personal loan to or for any director or executive officer." 15 U.S.C. § 78m(k)(1). And as set out in the Deloitte Report, Swedish law prohibits loans to any legal person over whom any member of the Board or the CEO of the company has controlling influence.

68.     In or after May 2019, at Oasmia's request, the Swedish Tax Agency examined the transfers. The Swedish Tax Agency found that the transfers violated the Swedish Accounting Act because the transactions have not been recorded and it may not be possible to determine Oasmia and Alceco's tax liabilities. The violations may carry criminal penalties.

69.     SOX requires an entity's principal executive officer and principal financial officer to certify, as to each annual report, that they had disclosed all illegal acts involving management that they knew of to Oasmia's audit committee. Because Defendants did not disclose the Cash Sweeps to Oasmia's audit committee, these certifications were false.

70.     The securities laws mandate that registrants, including foreign private issuers like Oasmia, develop and maintain internal controls over financial reporting, including foreign private issuers like Oasmia. SEC registrants must also disclose all material weaknesses in internal controls in their annual reports. A material weakness is a deficiency or combination of deficiencies

in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be timely prevented or detected.

71.     Internal controls must provide reasonable assurances that, among other things, "transactions are recorded as necessary to [] permit preparation of financial statements in conformity with generally accepted accounting principles," ("Recording Provision"), "access to assets is permitted only in accordance with management's general or specific authorization" ("Access Provision"), and "transactions are executed in accordance with management's general or specific authorization" ("Approval Provision"). 15 U.S.C. §78m(b)(2)(B)(i)-(iii). These transactions must be recorded in "books, records, and accountings which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer" ("Bookkeeping Provision"). 15 U.S.C. §78m(b)(2)(A).

72.     SOX requires an entity's principal executive and financial officers to certify, as to each annual report, that they had evaluated the company's internal controls and disclosed all significant deficiencies or material weaknesses in internal controls that occurred during the reporting period to the entity's audit committee.

73.     The Cash Sweeps exposed several material weaknesses in Oasmia's internal controls over financial reporting.  First, the transactions were off-the-books, and so violated both the Recording and Bookkeeping Provisions. In fact, they caused material errors in Oasmia's financial statements.

74.     Second, between 2008 and 2017, Oasmia lost control over a material portion of its cash for all but a few days each month.  Instead of being under Oasmia's control, the cash was

held in accounts controlled by Aleksov and Cederstrand.  Because it did not have access to its assets, Oasmia violated the Access Provision.

75.     Third, Aleksov was able to unilaterally transfer the material portions of Oasmia's cash every month without approval from Oasmia's CEO or Board of Directors. Oasmia's internal controls thus violated the Approval Provision.

76.     In their reports on internal controls over financial reporting, Defendants never disclosed (a) the Cash Sweeps, and also the following material weaknesses in Oasmia's internal controls: (b) that Oasmia's financial records did not record the Cash Sweeps, (c) that Oasmia lacked control over a material portion of its cash at all times except a few days each months, and (d) that Aleksov could transfer a material amount of Oasmia's cash without oversight.

77.     Defendants also failed to disclose the 2014-2016 tax audit in Oasmia's financial statements, nor the Swedish Tax Agency's conclusion that Oasmia had violated the Swedish Accounting Act.

78.     Paragraphs 243-347397 below, identify the statements Defendants made during the Class Period that are false and misleading for the reasons set out in ¶¶ 47-77, above.

**B.     Defendants Falsely Report Additional Compensation Paid To Aleksov and Cederstrand As a Related-Party Transaction**

**1.     Ardenia Sells To Oasmia Patent Rights Oasmia Already Owns**

79.     Oasmia's intellectual property are patents it has obtained from Ardenia, owned by Aleksov and Cederstrand.

80.     In a resolution decided on November 1, 2017 ("Resolution"), Oasmia agreed to pay SEK 10.55 million to acquire from Ardenia the rights to an 8-year extension of patents Ardenia had registered, XR17 ("XR17 Extension").

81.     Ardenia had already conveyed all rights to XR17 to Oasmia, including all rights to extend the patent.

82.     Thus, Oasmia was paying 10.55 million SEK for patent rights it already owned.

83.     Oasmia's Code of Ethics includes as an example of a transaction which raises a conflict of interest on where an employee has "an interest in a transaction involving the Company." The Code of Ethics further provides that "[a]ll […] executive officers should endeavor to avoid situations that present a potential or actual conflict between their interest and the interest of the Company."

84.     Oasmia's Code of Ethics further provides for waivers, including to the conflict of interest provisions, if warranted.  Only a majority vote of the Board of Directors can waive an executive officer or director's conflict of interest. The Code of Ethics further mandates that if "any substantive amendment is made or any waiver is granted, the waiver will be posted on the Company's website or in a Current Report on Form 8-K [sic]2, allowing shareholders to evaluate the merits of the particular waiver."

85.     The Resolution was adopted per capsulam, which is a resolution adopted by a board of directors by email outside of a regular board meeting. Per capsulam resolutions are only intended to be used for emergency matters that cannot wait for a regular board meeting.  There was no legitimate reason to use a per capsulam resolution to purchase the extension, even if Oasmia had not already owned it. XR17's patent did not expire until 2028. Further, Aleksov's employment agreement prohibited him from competing with Oasmia, so Aleksov could not shop the patent extension to other persons.

_____

[2] Oasmia files Current Reports on Form 6-K.

86.     Aleksov and Cederstrand prepared the per capsulam resolution and forced its acceptance by other Board members on very short notice. Aleksov and Cederstrand were interested parties as to the acquisition of the patent rights because they owned it. Because they participated in approving the transaction, they were required to obtain approval of a majority of Oasmia's board of directors, which would be reflected in a Board of Directors resolution, and published online or filed in a 6-K. Yet not only was there no public disclosure, the board minutes for the *per capsulam* Resolution state that neither Aleksov nor Cederstrand participated in the decision to acquire the XR17 Extension because of conflicts of interest.

87.     Further, payment records for the SEK 10.55 million authorized by the per capsulam Resolution show that it was paid not to Ardenia but directly to Aleksov and Cederstrand's creditor.

88.     The Members of the Board who approved the transaction, as well as Aleksov and Cederstrand's involvement therein without a waiver, were Aleksov, Asp, Cederstrand, Kotsina, and Langö.

89.     Thus, Aleksov and Cederstrand initiated and forced through a fake transaction to pay themselves SEK 10.55 million. The Board of Directors, knowing that Aleksov and Cederstrand had initiated and forced through the transaction, nevertheless signed Board minutes that falsely asserted that Aleksov and Cederstrand had recused themselves from the transaction. Though required to publicize the waiver by the Company's Code of Ethics, Defendants never did so.

**2.     Disclosing the Acquisition of the Patent Rights From Ardenia As A Related-Party Transactions Understated Aleksov and Cederstrand's Compensation**

90.     Oasmia was required to disclose via 6-K, but did not, that it had granted a waiver to Aleksov and Cederstrand to participate in a transaction in which they had an interest.

91.     Form 20-F requires disclosure of all compensation paid to Board members. Item 6.B. IFRS likewise require disclosure of all management compensation. IAS 24 17.

92.     Because Oasmia did not receive anything in return for XR17 Extension, its acquisition was not a related party transaction. Instead, it was additional compensation of SEK 10.55 million paid to Aleksov and Cederstrand. Oasmia filings that set out Aleksov's and Cederstrand's total compensation for the year ended April 30, 2018 stated that it was SEK 2.8 million and SEK 0.2 million, respectively. These compensation figures were false for failing to include the SEK 10.55 million paid to Aleksov and Cederstrand for no consideration.

93.     The Resolution and minutes recording its approval inaccurately recorded the basis for the resolution and the deliberations leading to it. The Resolution therefore violated the Approval Provision, in that it inaccurately recorded the nature of management's authorization, as well as the Recording Provision, in that it inaccurately recorded that Oasmia had maintained accountability for its assets though it violated its own procedures to allow Aleksov and Cederstrand to force Oasmia to transfer SEK 10.55 million to their creditors. The Resolution also violated the Approval Provision because the payment was not made to Ardenia, as the Board authorized, but to Aleksov and Cederstrand's creditor.

94.     Oasmia's financial records did not report that it had not received any consideration for the transfer of SEK 10.55 million because it already owned the patent it purchased. Oasmia's failure to properly record the nature of the transaction violated the Bookkeeping and Recordkeeping Provisions in that it prevented Oasmia from properly recording the transfer of SEK 10.55 million as additional compensation to management.

95.     Paragraphs 243-397, below, identify the statements Defendants made during the Class Period that are false and misleading for the reasons set out in ¶¶ 79-94, above.

**C.     Oasmia Recognizes A Credit Commitment From Alceco Which Alceco Has No Capacity To Pay**

**1.     Alceco Is Hit with An Arbitral Award It Cannot Pay**

96.     In October 2012, Oasmia obtained a SEK 40 million credit commitment from Alceco.

97.     The Credit Commitment's initial term was one year, but it was renewed every year until its termination on March 19, 2019.

98.     Oasmia never drew on the Credit Commitment.

99.     Alceco did not have SEK 40 million on hand. While it held a few thousand Euros in cash, its only important asset was Oasmia shares. To fund the Credit Commitment, Alceco would have to either sell Oasmia shares or obtain a loan secured by those shares.

100.     The Credit Commitment existed in large part so that Oasmia would have access to ready cash in an emergency. Yet in an emergency, Oasmia's share price would likely fall dramatically. Thus, in an emergency, Alceco may not be able to obtain a loan secured by its Oasmia shares or sell enough shares to fund the Credit Commitment.

101.     Further, in November 1, 2016, an arbitrator entered an award of SEK 65 million against Alceco in favor of Nexttobe. Alceco has not been able to pay the award because of its poor financial condition.

102.     By May 1, 2018 at the latest, Nexttobe obtained an injunction to pay the arbitral judgment and a writ of execution from the Swedish Enforcement Authority.

103.     Accordingly, at all times since November 2016, Alceco has had an outstanding multimillion-dollar award entered against it.

104.     Alceco's financial condition was too poor to extend any credit to Oasmia. Accordingly, the Credit Commitment was worthless.

105.    In all annual financial statements filed after November 2016, the Credit Commitment was Oasmia's only substantial source of untapped liquidity.

106.    The Credit Commitment exceeded Oasmia's cash and cash equivalents for all annual financial statements filed after November 2016.

107.    No financial statement filed after November 2016 disclosed that Alceco was unable to fulfill its commitments set out in the Credit Commitment.

108.    Deloitte has found that the existence of the Credit Commitment "may have been of significant importance for outside assessment of Oasmia's ability to continue operations." Deloitte added that the false disclosures concerning the Credit Commitment "could lead to an investigation by either the Disciplinary of the [Stockholm] Stock Exchange, Swedish Financial Supervisory Authority [], or the Board for Swedish Financial Reporting Supervision, resulting in the form of potential fines."

**2.      Defendants Misleadingly Claim That Oasmia Has Access to the Credit Commitment.**

109.    The Credit Commitment was prominently displayed in all of Oasmia's annual filings as well as in the Registration Statement. Through disclosing the Credit Commitment, the Defendants represented that Oasmia had SEK 40 million of untapped liquidity.

110.    Throughout the Class Period, these statements were misleading for failing to disclose that Oasmia might not be able to draw on the Credit Commitment in an emergency.

111.    After November 2016, these statements were additionally misleading because Oasmia could not draw on the Credit Commitment at all.

112.    Accordingly, all statements made about the Credit Commitment misleadingly overstated Oasmia's liquidity.

- 20 -

113.    In certain filings, Defendants also falsely maintained that Oasmia had drawn on the credit facility, which was false because Oasmia never had done so.

114.    Paragraphs 243-347397, below, identify the statements Defendants made during the Class Period that are false and misleading for the reasons set out in ¶¶ 96-113, above.

**D.    Oasmia Misstates the Terms of Convertible Bonds By Labelling The Transactions As Completed Though Aleksov and Cederstrand Would Only Pay the Agreed-Upon Consideration If and When the Bonds Were In the Money**

**1.    Oasmia Issues Convertible Bonds But Does Not Collect Payment**

115.    Since listing on the Stockholm Stock Exchange in 2012, Oasmia has completed seven convertible bond offerings:

(a)    On April 15, 2016, Oasmia sold SEK 28 million of bonds convertible into Ordinary Shares at a price of SEK 11.70, or a 5.4% premium on the April 14 closing price.

(b)    On June 10, 2016, Oasmia sold SEK 42 million of bonds convertible into Ordinary Shares at a price of SEK 12, or a 11.4% premium on the June 9 closing price.

(c)    On March 31, 2017, Oasmia sold SEK 42 million of bonds convertible into Ordinary Shares at a price of SEK 5.95, or a 4.6% premium on the June 9 closing price.

(d)    On November 30, 2017, Oasmia sold SEK 28 million of bonds convertible into Ordinary Shares at a price of SEK 3.1, or a 5.1% premium on the June 9 closing price.

(e)    On April 19, 2018, Oasmia sold SEK 26 million of bonds convertible into Ordinary Shares at a price of SEK 3.1, or a 5.1% premium on the previous day's closing price.

- 21 -

(f)     On September 7, 2018, Oasmia sold SEK 35.2 million of bonds convertible into Ordinary Shares at a price of SEK 7.2, or a 11.3% premium on the previous day's closing price.

(g)     On November 1, 2018, Oasmia sold SEK 26 million of bonds convertible into Ordinary Shares at a price of SEK 14.5, or a 15.1% premium on the previous day's closing price.

116.    Each convertible bond offering had the following terms, among others:

(a)     The convertible bonds could be converted to equity at a market premium above the stock price at the time of issuance.

(b)     The convertible bonds have a maturity date. The convertible bond holder may exercise the holder's conversion rights at any time before the maturity date. If the convertible bond holder has not converted at the time of the maturity date, then Oasmia pays the holder the principal and accrued interest.

(c)     The Board of Directors may extend the subscription and maturity dates.

117.    The Board never documented any extension of either the subscription or maturity dates.

118.    The Board was responsible for ensuring that Oasmia received payment for the convertible bond issuances.

119.    In many cases, the purchasers did not pay for the convertible bonds they purchased unless and until Oasmia's stock price exceeded the conversion price. The payments were thus late or never made. Because Defendants would only pay for their bonds if they were in the money, Defendants' description of the transaction as a sale of convertible bonds was misleading. Instead,

- 22 -

in economic substance, Oasmia had issued – free of charge – warrants to buy Oasmia Ordinary Shares at the convertible bonds' exercise price.

120.    Aleksov and Cederstrand participated in the fraud. For example, through Vasilka Holding, a company they owned, Aleksov and Cederstrand purchased SEK 6 million of the fourth offering (nearly a fifth of the offering), but only paid 133 days after the supposed maturity date. Vasilka thus made a risk-free arbitrage profit of SEK 3.5 million, or more than 50% of its investment. Vasilka further subscribed for SEK 29 million in convertible bonds in the seventh offering but never paid Oasmia. Vasilka's purchases accounted for almost a third of the offering.

**2.    Aleksov and Cederstrand's Convertible Bond Purchases Were Awards of Warrants and Had To Be Disclosed As Such**

121.    Pursuant to SEC regulations and IFRS, Oasmia was required to disclose Aleksov and Cederstrand's compensation.

122.    Pursuant to SEC regulations and IFRS, Oasmia was required to separately disclose Aleksov and Cederstrand's compensation from issuance of securities as well as the number and exercise price of any warrants issued. IAS 24 17.(e); Form 20-F, Item 6.B.

123.    Each offering in which Aleksov and Cederstrand subscribed was in economic substance the issuance to them of warrants in the amount of their subscription at an exercise price that was the conversion price.

124.    Every year in which Aleksov and Cederstrand subscribed to convertible bonds, Defendants were required to disclose:

(a)    The effective equivalent in warrants of each convertible bond subscription Aleksov and Cederstrand made; and

(b)    The cash value of the warrants Aleksov and Cederstrand effectively acquired by subscribing to convertible bond offerings.

- 23 -

125.     Further, Defendants' descriptions of "convertible bond offerings" were misleading because in economic substance, the transactions were the award of warrants for no consideration.

126.     The failure to record the true terms of the "convertible bond offerings" caused misstatements in Oasmia's financial records, thus violating the Bookkeeping and Recordkeeping Provisions. The failure to adhere to the contractual terms of the "convertible bond offerings" also violated the Approval Provision in that Aleksov and Cederstrand acted contrary to the Board's specific authorization.

127.     Paragraphs 243-397, below, identify the statements Defendants made during the Class Period that are false and misleading for the reasons set out in ¶¶ 115-126, above.

**E.    Defendants Falsely State That Oasmia Is Ready To Spin Off Its Veterinary Medical Assets**

128.     On May 21, 2018, Oasmia issued a press release claiming that it had transferred all its veterinary medicinal assets to its wholly-owned U.S.-based subsidiary, AdvaVet. Oasmia added that it had recruited a CEO with an extensive background in veterinary medicine and a CFO with years of experience working for American publicly traded companies, and appointed a Board of Directors, four of five of which were based in the U.S., who had significant experience in commercial and financial business operations.

129.     These purported steps prepared AdvaVet for its IPO in the U.S., which would raise much-needed capital.

130.     The information was repeated in Oasmia's 2018 20-F.

131.     In fact, AdvaVet did not finalize an employment agreement with its CEO and CFO until March 4, 2019.

132.     Oasmia was thus in no position to spin off AdvaVet for cash.

- 24 -

## VI. E&Y FRAUDULENTLY CERTIFIED THAT OASMIA'S FINANCIAL STATEMENTS WERE ACCURATE

**A.     E&Y Misleadingly Told Investors That Oasmia's Financial Statements Were Presented In Accordance With IFRS, That E&Y's Audits Had Followed PCAOB Standards, And That E&Y Had Taken Internal Control Deficiencies Into Account In Planning Its Audits**

133.    With multiple serious red flags and glaring fraud risks, Oasmia was exactly the kind of client that demanded a serious and thorough audit. Instead, E&Y rushed through its Oasmia audits. E&Y ignored the facts which proved Oasmia's fraud and recklessly certified that its financial statements were materially accurate, violating the federal securities laws.

134.    E&Y audited every one of Oasmia's financial statements between the year ended April 30, 2009, through to the close of the Class Period.

135.    E&Y stated in the Registration Statement and each of Oasmia's 20-Fs that Oasmia's financial statements included therein "present fairly, in all material respects, the consolidated financial position of Oasmia [] and the consolidated result of its operations and its cash flows [] in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board." E&Y also accompanied each of these statements with an explanation of its grounds to make them – namely that it "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)" ("PCAOB" and "PCAOB Standards").

136.    The facts and documents available to and necessarily reviewed by E&Y fairly screamed that Oasmia was a high fraud risk. First, the weakness of Oasmia's board was a red flag. Oasmia's board minutes regularly failed to justify the basis for decisions and sometimes did not include authentic wet signatures. Further, Oasmia's board engaged in bizarre conduct, such as meeting *per capsulam* to approve a related-party transaction that was anything but urgent. Second, high turnover in key positions was a red flag. Oasmia had 3 CFOs in 4 years during which it spent

6 months without one, and it lauded Lönners when it made him the Chair of its Board only to fire and disparage him months later for, among other things, hesitating to sign its financial statements. Moreover, Oasmia's CEO, Defendant Asp, was elevated to the position from VP of Quality Control.

137.    These, and other red flags, should have put E&Y on high alert. Instead, E&Y conducted an audit which amounted to no audit at all. As reflected in its billings, E&Y's audit fees never exceeded a few hundred thousand dollars:

*In thousand SEK*

| Year Ended April 30 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Audit Fees | 425 | 1,405 | 1,390 | 1,729 | 1,733 |
| Audit-Related Fees | 4,930 | 1,363 | 800 | 800 | 1,200 |
| Total fees | 5,355 | 2,768 | 3,849 | 2,529 | 2,933 |

*In thousand USD*

| Audit Fees | 65 | 168 | 173 | 195 | 198 |
|---|---|---|---|---|---|
| Audit-Related Fees | 758 | 163 | 306 | 90 | 137 |
| Total fees | 823 | 330 | 479 | 285 | 335 |

*Source: Oasmia annual reports. "Audit fees" are fees incurred in connection with the audit of Oasmia's annual financial statements. "Audit related fees" are fees incurred for auditing work not in connection with Oasmia's annual audits, such as review of Oasmia's quarterly financial statements and quality assurance.*

138.    Yet even if E&Y conducted a normal, and not heightened, audit, the documents it obtained would have alerted it to the fraud. In the course of an audit, E&Y must obtain Oasmia's bank statements for the month after the closing of Oasmia's financial statements. These bank statements show the fraudulent Cash Sweeps. E&Y likewise must obtain the bank statements for the account that received the convertible bond proceeds. These bank statements, too, show that Oasmia did not timely receive payments for the convertible bond. E&Y must review all board resolutions, too, including the November 2017 *per capsulam* Resolution which the Board used to

approve a related-party transaction that was not urgent. E&Y's subsequent investigation would have shown that the minutes falsely represented the transaction's basis or that the Resolution falsely represented its terms, or both. And E&Y must either obtain documents proving that Alceco could fund the SEK 40 million Credit Commitment or explain that the scope of its audit did not allow it to prove as much. It did neither, because the documents would have shown that Alceco could not fund the Credit Commitment.

139.     A client like Oasmia demands a careful and thorough audit. E&Y did the opposite. It rushed through the audit without examining obvious red flags that came to its attention. E&Y's audit amounted to no audit at all.

**B.     E&Y Violated PCAOB Standards In Failing to Detect Aleksov's Skimming Oasmia's Interest**

140.     PCAOB Standards explain that "[i]n representing that the financial statements are presented fairly in conformity with the applicable financial reporting framework, management [] makes assertions regarding the [] various elements of financial statements and related disclosures." AS 1105.11. If the assertion has a "reasonably possibility of containing a misstatement or misstatements that would cause the financial statements to be materially misleading", it is called a relevant assertion. AS 2201.A9.

141.     Auditing Standards require that "[t]he auditor [] design and perform audit procedures in a manner that addresses the assessed risks of material misstatement for each relevant assertion of each significant account and disclosure." AS 2301.08. Auditors must "perform substantive procedures for each relevant assertion." AS 2301.36.

142.     Among other relevant assertions, an auditor must ensure that the audited entity's financial statements accurately state the cash the company has available. Auditors must thus obtain proof of the company's bank balances as of the close of the fiscal year being audited.

Auditors meet this requirement by asking the bank to tell the auditor how much cash the entity has in its bank accounts.

143.    An entity's financial records must report all the entity's transactions. To test the completeness of these transactions, auditors must ensure that the closing cash balance reconciles with the company's financial records. For example, if Oasmia began the year with $100 in its bank account, received no interest, and its financial records show that during the year total deposits were $50, and total withdrawals $0, the auditor should check that at the close of the fiscal year Oasmia has $150 in its accounts. If the bank tells Oasmia the company has $75, then there are missing transactions.

144.    Many transactions that are undertaken and recorded during a fiscal year are not processed until after the close of the fiscal year. For examples, not all checks are immediately cashed, and even checks and deposits that are cashed or deposited will take some time to clear.

145.    Accordingly, the auditor must also ensure that there are no pending transactions in the days following the close of the entity's financial period. In the above example, if Oasmia's bank accounts show $150, then the transactions might appear to be complete, but if Oasmia issued a check for $50 on April 30 which was not cashed until May 1, then Oasmia's financial records are missing transactions.

146.    Thus, to ensure that the company's cash is accurately stated and that all transactions are listed, the auditor must review the bank statements for the month after the close of the entity's fiscal year – there is simply no other way. That bank statement will show all additional transactions that were entered into in the reporting period where payment was made or received after the reporting period.

147.    As Oasmia's fiscal year closes on April 30, E&Y obtained Oasmia's bank statements for May 2015-2018.

148.    Each of the May bank statements Oasmia obtained showed the Cash Sweeps - a large cash transfer at the beginning of the month and a large cash deposit for the same amount of money at the close of the month. See ¶¶47-56, above.

149.    E&Y thus had evidence in its hands of Aleksov's Cash Sweeps.

150.    Because the transactions were so unusual, E&Y was required to investigate them. Any conceivable investigation would have determined the transactions were fraudulent:

> (a)    Had E&Y sought to use documents to understand the Cash Sweeps' purpose, it would have found that they were not recorded in Oasmia's financial records;

> (b)    Had E&Y sought to have a person explain the Cash Sweeps' purpose, it would have spoken with the person responsible for processing Oasmia's transactions or the person responsible for recording them in its financial statements (e.g., a senior accountant or controller) and found that the person did not process or record the transaction and was not aware that they had been entered into.

151.    E&Y thus knew or was reckless in not knowing that at the beginning of every May (at least), Oasmia transferred large amounts of its cash to its Executive Chairman, receiving an equivalent amount at the end of the month, and that these transactions were not recorded on its financial statements. It is difficult even to imagine a non-fraudulent explanation for these Cash Sweeps.

- 29 -

C.   **E&Y Violated PCAOB Standards By Failing To Determine that Oasmia Did Not Receive Payments For Convertible Bond Sales**

152.    Each of Oasmia's 2015-2018 financial statements disclosed that there was substantial doubt about whether it could continue as a going concern for the next twelve months. In each year's financial statements, Oasmia stated that while current sources of liquidity were insufficient, it would be able to raise enough cash to fund its operations.

153.    Oasmia raised this cash through convertible bond offerings. That Oasmia obtained the cash from the offerings was critical to investors.

154.    Defendants publicly disclosed all of the convertible bond offerings set out in ¶115, above, as well as terms such as the date payment was due.

155.    Auditors must confirm material entries in entity's financial statements such as, here, the payment of the convertible bonds.

156.    To confirm payment of convertible bonds, auditors will review bank statements for the accounts to which payment for the convertible bonds was made.

157.    Had E&Y reviewed the bank statements for the time in which payment for the convertible bonds was to be made, it would have found that the payments were not made.

158.    Accordingly, E&Y either recklessly failed to review bank statements or recklessly ignored what it found.

D.   **E&Y Violated PCAOB Standards By Failing To Identify Fraud In The "Purchase" Of The XR17 Extension**

159.    E&Y knew that Oasmia's acquisition of the XR17 Extension was a related-party transaction:

    (a)    The counterparty was Ardenia, an entity which the financial statements E&Y audited disclosed was owned by Aleksov and Cederstrand;

(b)     The transaction was identified as a related-party transaction in the *per capsulam* Resolution approving it; and

(c)     The transaction was identified as a related-party transaction in the 2018 20-F that E&Y audited.

160.    Auditing Standards mandate that auditors must undertake additional procedures to scrutinize related-party transactions. First, the auditor must "[d]etermine whether the transaction has been authorized and approved in accordance with the company's established policies and procedures regarding the authorization and approval of transactions with related parties." AS 2410.12(c).

161.    The procedural irregularities should have put E&Y on high alert. Oasmia approved the patent acquisition through a *per capsulam* Resolution. The use of an emergency procedure when there was no urgency is a red flag demanding additional scrutiny. The scrutiny would have revealed:

(a)     The minutes of the proceeding documenting adoption of the Resolution stated that Aleksov and Cederstrand had recused themselves from discussion. Yet the email traffic leading to the Resolution showed they had forced the resolution on Oasmia's directors. Thus, each director had personal knowledge that the minutes were misleading and would have said as much had E&Y asked. Allowing Aleksov and Cederstrand to participate violated Oasmia's procedures in two ways.

(1)     The Board of Directors must waive all conflicts involving Oasmia's executives. Because the minutes stated that Aleksov and

- 31 -

Cederstrand had not participated, the Board of Directors clearly did not waive Aleksov and Cederstrand's participation.

(2)     The Board of Directors must issue a 6-K announcing each waiver it grants to Oasmia's executives. No such 6-K was filed.

(b)     Oasmia transferred payment for the patent not to Ardenia but directly to Aleksov and Cederstrand's creditor. The creditor was not identified as the recipient in the minutes or the *per capsulam* Resolution. The transfer was thus ultra vires.

162.    Accounting standards also demanded that E&Y "[r]ead the underlying documentation and evaluate whether the terms and other information about the transaction are consistent with explanations from inquiries and other audit evidence about the business purpose (or the lack thereof) of the transaction." AS 2410.12(b).

163.    According to the financial statements in the 2018 20-F, "Oasmia acquired new patent rights [from Ardenia to] extend the protection of XR17 for a further 8 years to 2036." Yet this business purpose was inaccurate, as Oasmia already owned these patent rights. Thus, the "documentation" showed that the patent acquisition was not consistent with management's explanations. Instead, the payment Oasmia purportedly made for the patent was additional compensation for Aleksov and Cederstrand.

164.    Oasmia's compensation policies, set out in each of its 20-Fs, are that "[r]emuneration of the Chairman of the Board and members of the board of directors is decided at each annual general meeting."  Yet in violation of this policy, Oasmia awarded Aleksov and Cederstrand substantial additional compensation through the *per capsulam* Resolution.

165.    Thus, E&Y knew or was reckless in not knowing that Aleksov and Cederstrand had violated Oasmia's procedures by forcing the Board to enter into a transaction with them, falsely documented that they had recused themselves from the transaction, violated Osmia's procedures by failing to obtain or disclose a waiver, violated the *per capsulam* Resolution by making payment directly to their creditor, lied about the transaction's terms to investors, violated Oasmia's policies by increasing their compensation outside of an annual general meeting, and then lied about their compensation to investors.

166.    None of these facts was disclosed in the 2018 20-F.

**E.    E&Y Violated Auditing Standards By Failing To Examine Whether Alceco Could Fund The SEK 40 Million Credit Line**

167.    Oasmia claimed in all of the annual financial statements included in its Class Period annual reports that it had access to a SEK 40 million undrawn credit commitment from Alceco. See ¶¶96-108, above.

168.    The claim that Oasmia had access to the Credit Commitment was a relevant assertion at all relevant times. The Credit Commitment constituted substantially all of Oasmia's available liquidity at all relevant times. Further, the amount of the Credit Commitment was greater than Oasmia's total cash as of April 30, 2016, 2017, and 2018. Liquidity was also a paramount concern for investors because Oasmia received a warning in each of the Class Period annual reports that "the Company has recurring losses from operations and an accumulated deficit that raise substantial doubt about its ability to continue as a going concern." Indeed, the Deloitte Report finds that Credit Commitment "may have been of significant importance for outside assessment of Oasmia's ability to continue operations."

169.    Disclosing the Credit Commitment without disclosing that Alceco had no ability to fund it misleadingly informed investors that the SEK 40 million credit was actually available.

E&Y thus needed to perform sufficient substantive procedures to show that Alceco actually could supply the funding it promised.

170.    Alceco is an investment vehicle with no employees or operations. There is not substantial public information which proves it can supply SEK 40 million in credit. E&Y thus needed to perform additional substantive procedures.

171.    Further, Oasmia's own actions cast doubt on the Credit Commitment's availability. Oasmia took out a loan from Nexttobe, which it kept extending, which bore interest at a rate of 8.5%. Borrowed funds from the Credit Commitment drew interest at a rate of 5%. Oasmia's decision to take out the Nexttobe loan and continue to extend it while not drawing on the Credit Commitment at all demanded further investigation from E&Y.

172.    All of Oasmia's Class Period annual reports, which E&Y audited, disclosed that Alceco was a related party. Further, the Credit Commitment is identified in each Class Period annual financial statement as a related party transaction. E&Y thus understood that the Credit Commitment was from a related party. While inquiry from third parties may be sufficient to support a relevant assertion, "[i]nquiry of company personnel, by itself, does not provide sufficient audit evidence to reduce audit risk to an appropriately low level for a relevant assertion." AS 1105.17. Because Aleksov and Cederstrand are Alceco's only principals or employees and are also Oasmia's "company personnel", there was no one E&Y could simply ask to represent that Alceco was able to fund the Credit Commitment.

173.    E&Y was thus required to obtain documentary evidence from Alceco – a balance sheet at a minimum – to indicate that it could fund the Credit Commitment. Yet Alceco's balance sheet would have revealed a liability of SEK 65 million to Nexttobe. It would further reveal that Alceco's only asset was Oasmia stock.

174.     Auditing standards permit auditors to issue "qualified opinions", which expresses an opinion but expressly identifies matters the auditor was not able to support with sufficient evidence. AS 3105.01. If E&Y was not able to obtain Alceco's balance sheet, it was required to express a scope limitation indicating as much.

**F.     Additional Red Flags**

175.     PCAOB Standards require that auditors consider the risk of fraud in an audit and identify several risk factors that serve as red flags. AS 2401 A.2. Oasmia presented an alarming number of serious fraud risks.

(a)     "Operating losses making the threat of bankruptcy, foreclosure, or hostile takeover imminent." Oasmia received going concern warnings every year.

(b)     "Information available indicates that management or the board of directors' personal financial situation is threatened by the entity's financial performance arising from the following: Significant financial interests in the entity." Aleksov and Cederstrand owned nearly 20% of Oasmia.

(c)     "Related party transactions that are also significant unusual transactions (e.g., a significant related party transaction outside the normal course of business)." Alceco provided the unused Credit Commitment, while Oasmia purchased the patent from Ardenia. Both transactions were outside the normal course of business. Beyond that, Alceco's business is to seek approval for products that are based on Ardenia's patents.

(d)     "There is ineffective monitoring of management as a result of the following:

(1)     Domination of management by a single person or small group (in a nonowner-managed business) without compensating controls

(2)     Ineffective board of directors or audit committee oversight over the financial reporting process and internal control

(3)     The exertion of dominant influence by or over a related party."

Oasmia's board was unable to complete and maintain adequate board minutes, showing that it was ineffective. Oasmia made decisions in bizarre ways, such as the use of a *per capsulam* Resolution for a purchase that was not at all urgent. Aleksov and Cederstrand dominated Oasmia.

(e)     "There is a complex or unstable organizational structure, as evidenced by the following:

(1)     High turnover of senior management, counsel, or board members." Oasmia had 3 CFOs in less than 4 years. It went without a CFO between March 31 and November 1, 2016. Oasmia triumphantly retained Lönners as Chair of its Board and then fired him months later.

(f)     "Internal control components are deficient as a result of the following:

(1)     High turnover rates or employment of ineffective accounting, internal audit, or information technology staff"

Oasmia had 3 CFOs in less than 4 years. It went without a CFO between March 31 and November 1, 2016.

(g)     "Management failing to correct known reportable conditions on a timely basis." For each of the years ended April 30, 2016-2018, Oasmia reported two internal control deficiencies: (1) lack of "sufficient resources and processes in place, including controls in the finance and accounting department, to adequately perform a timely financial statement close

process resulting in errors in period-end accruals related to capitalized research and development expenses," and lack of "adequate internal review processes in place over critical accounting areas including timely operation whereby management identifies and resolves significant or complex accounting matters." Oasmia failed to remedy these deficiencies in three years.

## VII.    THE TRUTH CONCEALED BY DEFENDANTS' FALSE STATEMENTS CAUSES OASMIA'S CATASTROPHIC LOSSES

176.    Oasmia has been trading on the Stockholm Stock Exchange since 2012.

177.    Searching for new markets in which to sell its shares, on October 23, 2015, Oasmia completed its IPO on U.S. markets. In the IPO, Oasmia sold 2,339,200 ADSs, each representing 3 shares. For every two ADSs they purchased, for an additional $0.05 investors could also buy one warrant to purchase an additional ADS at a price of $4.06.

178.    Oasmia also granted the IPO's underwriters an option to sell additional ADSs and warrants, which they partially exercised to sell 222,3000 additional ADSs.

179.    In total, Oasmia sold 2.56 million ADSs in its IPO.

## A.    A Competent Director Resigns Upon Discovering Defendants' Fraud

180.    On October 24, 2016, Oasmia issued a press release announcing that it had acquired a project developing a cancer cure. In exchange, Oasmia paid Karo Pharma 3,080,000 newly-issued shares with a value of SEK 25 million. Oasmia also agreed to pay Karo Pharma 20% of all future revenues generated by the project for Oasmia.

181.    Aleksov was quoted in the press release as saying that "[a] prerequisite in this transaction from our side has been to get access to Anders Lönners['s] [Executive Chairman of

- 37 -

the Board at Karo Pharma] unique track record in developing companies and his international business experience."

182.    A month later, Anders Lönners was elected Chairman of Oasmia's board.

183.    The relationship between Lönners and Oasmia quickly fell apart as he recognized the scope of Oasmia's unlawful practices.

184.    Within a week of his election, Lönners expressed concern about Oasmia's interim report for the 3 months ended October 31, 2016. Lönners initially refused to sign the report, though he did eventually do so.

185.    The relationship between Lönners and Oasmia completely collapsed in January/February 2017.

186.    On February 2, 2017, without disclosure, Karo Pharma's board voted to sell all the shares it received from Oasmia. On March 3, Karo Pharma announced that it had completed the sale. Karo Pharma's sale of its Oasmia shares sale resulted from frayed relations between Oasmia and Karo Pharma rather than any need Karo Pharma might have had for the cash. Indeed, in April 2017, Karo Pharma announced that it would distribute the entire sales proceeds as a special dividend to its shareholders.

187.    Then, on February 28, 2017, after close of trading, Lönners announced that he was leaving Oasmia's board. Lönners was quoted as saying that "I have given my views on what needs to be done and am available to the company, but leave the board."

188.    In response, on March 1, Oasmia issued a press release falsely accusing Lönners of a medley of misconduct while admitting that Lönners had initially hesitated to sign Oasmia's report for the three months ended October 31, 2016.

- 38 -

189.    On March 1, 2017, the price of Oasmia's ADSs fell from $2.29 to $1.85, or 19.3%, damaging investors.

**B.      Aleksov and Cederstrand Attempt to Retire a Crippling Loan**

190.    In February 2012, Oasmia took out an SEK 105 million loan from Nexttobe.

191.    The Nexttobe loan was an albatross around Oasmia's neck. Oasmia extended the Nexttobe loan every year and was not able to not pay off interest as it accrued.

192.    In December 2014, Nexttobe converted SEK 35 million of its loan, consisting of all accrued interest and SEK 19 million of principal, to equity, leaving SEK 86 million outstanding. Nexttobe thereby became a substantial Oasmia shareholder with a director on its Board.

193.    Yet Oasmia could not pay off the renewed loan, either, nor even make interest payments as they accrued. By April 2015, Oasmia had already accrued 2.7 million SEK in unpaid interest. By October 1, 2017, the total balance on the Nexttobe loan had reached 102.4 million SEK. While Nexttobe extended the loan for another year, it was growing impatient.

194.    To retire the Nexttobe loan, Oasmia obtained an SEK 108 million loan guarantee from two entities: (a) Arwidsro, Oasmia's largest shareholder, which agreed to contribute SEK 75 million; and (b) MGC, a previously unknown entity secretly owned by Aleksov's brother, which agreed to contribute the remaining SEK 33 million . The loan was to be funded by May 15, 2018.

195.    In consideration for the loan, Oasmia offered Arwidsro and MGC warrants to purchase 24,193,548 and 10,645,161 shares of Oasmia, respectively, at SEK 3.1 per share, or roughly $1 per ADS.

196.    The loan was announced on January 2, 2018. Within weeks, the warrants were substantially in the money, with the market price exceeding the strike price by as much as 50%.

- 39 -

**C.      Aleksov And Cederstrand Seize the Opportunity To Profit From An Unexpected Increase in Oasmia's Stock Price**

197.     Oasmia's board, in a meeting taking place January 23, 2018, resolved to issue 25,806,451 warrants to MGC, or about 250% of the agreed-upon amount, and none to Arwidsro. To justify its action, Oasmia's Board resolved that it would not ask Arwidsro to fund the loan and that it would treat Arwidsro's agreement as an offer Oasmia had never accepted.

198.     At a market price 150% above the strike price, MGC would make a profit of approximately SEK 40 million by exercising the warrants and immediately reselling the shares it acquired. Moreover, the terms of the offering were favorable to MGC, as Oasmia agreed to accept as payment a write-off of SEK 80 million of the Nexttobe loan MGC would acquire when MGC acquired it.

199.     In a press release dated September 7, 2018, Oasmia announced that MGC had exercised about 8.1 million warrants and been issued a corresponding number of shares. MGC paid for the warrants by setting off a debt of SEK 25 million. MGC sold the shares before October 31, 2018, for proceeds of at least SEK 57.3 million and as much as SEK 115.3 million. MGC stood to earn hundreds of millions of SEK for its remaining warrants.

200.     On September 21, 2018, Oasmia announced that the European Committee for Medicinal Products for Human Use had recommended approval of one of Oasmia's key products. That day, the price of Oasmia's ADSs soared from its previous day's close of $2.56 to close at $3.45.

201.     In or around October 2018, Arwidsro filed an action to, among other things, enjoin Oasmia from issuing the remaining shares to MGC that resulted from its exercise of warrants. In or around October 2018, upon Arwidsro's motion, a Swedish court enjoined the transfer, prohibiting Oasmia from registering MGC's remaining shares with its transfer agent.

**D.      Oasmia Opposes Arwidsro's Proxy Campaign**

202.    Having enjoined issuance of the warrants to MGC, Arwidsro launched a proxy battle for control of Oasmia.

203.    Under Swedish law, a shareholder owning more than 10% of a company, like Arwidsro, may compel a Board to hold an Extraordinary General Meeting ("EGM") to elect a new Board, a right which Arwidsro exercised on November 9, 2018.

204.    With no action from Oasmia, on November 26, 2018, Arwidsro filed a petition with the Swedish Companies Registration Office to convene an EGM. Arwidsro's petition was available to the public.

205.    That day, the price of Oasmia's ADSs fell from $4.33 to $3.90, down 11%, damaging investors.

206.    To moot Arwidsro's petition, on November 28, Oasmia agreed to hold the EGM Arwidsro had demanded. In the press release announcing the EGM, Oasmia claimed that Arwidsro's purpose was to improperly advantage itself in resolving the dispute involving MGC.

207.    On December 14, Oasmia set the meeting date for January 25, 2019.

208.    On January 21, 2019, a Sunday, Oasmia abruptly cancelled the January 25 meeting.  Oasmia's stated grounds were objections to the slate of directors Arwidsro proposed. Oasmia added that its "board of directors presently do not have the intention to issue notice to a new extraordinary general meeting on the basis of Arwidsro's request."

209.    On January 22, 2019, the price of Oasmia's ADSs fell from $3.12 to $2.55, down 16.2%, damaging investors.

210.    That same day, Arwidsro again petitioned the Swedish Companies Registration Office to convene an EGM.  On February 5, Oasmia again announced that it would hold the meeting Arwidsro demanded, this time on March 19.

211.    On March 1, 2019, Oasmia filed with the SEC an interim report announcing its results for the three months ended January 31, 2019.

212.    The interim report included a letter from the CEO (Asp) whose final paragraph provided:

> This quarter has unfortunately seen an ownership struggle in the company where Arwidsson Investment AB and Per Arwidsson have requested an Extraordinary General Meeting to change the composition of Oasmia's Board and management. Oasmia's Board was obliged to cancel the Extraordinary General Meeting as the proposal regarding the Board presented by Arwidsro did not meet Nasdaq's requirements on a number of counts, amongst other things regarding competence, experience and knowledge of the company. ***This is in breach of a number of rules and regulations and could be a threat to both the company's future business and its listing on the Stock Exchange.*** The company's Nomination Committee and the Board hope to be able to come to a mutual agreement with Arwidsro and its representatives before the next meeting of the shareholders.

213.    In response to the Company's claim that Arwidsro's slate of directors did not meet Nasdaq's requirements and their election could threaten Oasmia's listing, the price of Oasmia's shares fell from $3.14 to $2.60, down 17.2%, damaging investors.

214.    After scheduling the new EGM, Defendants desperately sought to create enough additional shares to defeat Arwidsro votes.

215.    On March 4, Oasmia announced that it had issued 22.9 million additional shares at a price of SEK 7.19 per share, a discount of approximately 12.3% from Oasmia's Ordinary Shares' March 4 closing price. These new shares accounted for 10.2% of Oasmia's fully-diluted share count.

216.    The new shares were sold to persons Defendants had reason to believe would vote in their favor in the upcoming EGM. Indeed, 42.4% of the new shares were sold to a single company, OncoGenerix USA, Inc., Oasmia's existing U.S. distributor. OncoGenerix would have an incentive to vote for Oasmia's existing board to receive a more lucrative distribution deal.

217.    On March 19, 2019, as announced, Oasmia held its EGM.  Then, on March 20, Oasmia announced that after an acrimonious meeting, Arwidsro's slate had been elected.

218.    With markets worried by Oasmia's previous claim that electing Arwidsro's slate would threaten Oasmia's listing, the price of Oasmia's ADSs fell from $3.04 on March 19 to close at $2.85 on March 20, down 6.1%, damaging investors.

219.    Then, on March 21, the Nasdaq issued a press release announcing that it would place Oasmia on "observational" status because there were circumstances that "cause[d] substantial uncertainty regarding the issuer or the price of the listed security." That day, the price of Oasmia's ADSs fell further to $2.63, down 7.7%, damaging investors.

220.    On March 25, the new Board announced that it would review Oasmia's situation to, among other things "ensure the correctness in and of[] the Balance sheet," "[t]o review also the related transactions between different interested parties," and "[t]o review the transactions that have been made of issues of shares, options and convertibles."

221.    On March 26, the Swedish Securities Council published a statement condemning the old Board's cancellation of the January 25 EGM, as well as Oasmia's commentary on Arwidsro's purported motives and the consequences of the election of its slate of directors.

222.    On June 12, 2018, pre-market, in a mandatory filing announcing that it owned less than 5% of Oasmia's shares, Alceco disclosed that it had sold about 8.9 million shares since March 2019. These shares amounted to more than 45% of its holdings. On June 12, 2019, the price of Oasmia's ADSs fell from its previous closing price of $1.59 to close at $1.35, down 15.1%, damaging investors.

- 43 -

223.    On June 26, 2018, Oasmia announced that it would hold a call with investors to discuss year end results and "the status of the board's previously communicated review of the company."

224.    On June 27, the price of Oasmia's ADSs fell from its previous close of $1.56 to close at $1.34, down 14.1%, on unusually heavy volume.

225.    Then, on June 28, 2019, Oasmia announced that it had identified "suspicious" and "remarkable" transactions between itself on the one hand and Alceco and Ardenia on the other. Oasmia reported that the transactions were not recorded in its books and records. Oasmia announced that it reported the transactions to the police.

226.    On this news, the price of Oasmia's ADSs fell further to $1.02, down 20.8%, damaging investors.

227.    On July 5, 2019, Oasmia announced that it had resolved its dispute with Arwidsro. The resolution called for Arwidsro to reduce Oasmia's obligation to it by SEK 75 million, pay SEK 75 million to exercise 24.2 million warrants, and pay SEK 40.2 million for a SEK 60.2 million claim Arwidsro held against MGC. In response, the price of Oasmia's ADSs increased from its previous close of $1.23 to close at $2.01, up 63.4%.

228.    On July 9, 2019, after the close of the market, Oasmia issued a press release that stated it had ended its relationship with former executive chairmen Julian Aleksov and filed a formal police report against him with the Swedish Economic Crime Authority.

229.    On July 10, the price of Oasmia's ADSs fell from their previous close of $2.6 to close at $2.26, down 13%, damaging investors.  The decline continued on July 11, with the price of Oasmia's ADSs falling further to $1.79. In total, the price of Oasmia's ADSs fell by 31.1% from its close on July 9.

230.    On August 23, 2019, Oasmia delisted its ADSs from the Nasdaq. The ADSs continued to trade over-the-counter in the U.S.

**E.    Oasmia And Its Advisors Conclude That Oasmia Had Committed Fraud.**

231.    Retained by the Special Examiner, Deloitte worked on a report to provide a recommendation to Oasmia's shareholders about whether they should release its Board Members for their conduct in the year ended April 30, 2019. The Deloitte Report ultimately found that "all Board members who have served on the Board during the financial years and until 18 March 2019 have or may have acted carelessly with respect to a number of decisions or measures," and that "[i]t is likely that damage has occurred or may occur in the future as a direct and predictable consequence of these decisions or measures."

232.    Among the Deloitte Report's findings were that:

- The former board caused Oasmia to commit a breach of contract in relation to Arwidsro in its attempt at reclaiming the subscription warrants. The former board also "acted recklessly in their handling of the subscription warrants," and their attempt to reclaim the subscription warrants and assign them to MGC without previously reaching an agreement with Arwidsro regarding the withdrawal was not "in line with the duty of loyalty and care the Board has towards Oasmia," particularly in light of the "risk exposure for Oasmia."

- The Swedish Securities Council issued a statement finding that the former board of Oasmia violated Generally Accepted Principles in the Securities Market and Swedish Companies Act ("ABL") rules in their handling of the extraordinary general meetings, finding that:

  o  that it is in violation of Generally Accepted Principles in the Securities Market to not issue summons to extraordinary general meeting when shareholder has made such request to a company's Board of Directors,

  o  that it is not incumbent on a company's Board of Directors to assess the advisability of new Board members proposed by a shareholder,

  o  that a shareholder's right to nominate Board members is not dependent on the work of the Nomination Committee,

  o  that, considering the directed issue that took place prior to the AGM, there was cause for Oasmia's existing Board of Directors to exercise restraint

- 45 -

with regard to measures that could result in changes to the composition of the shareholder base and, if this should become necessary, to strive for transparency in the measures, and

o   that Board members who, in their capacity as shareholders, collect powers of attorney, shall exercise caution and clearly show that the collection is performed in their capacity as shareholders.

o   The Deloitte Report concurred, concluding that the former board "acted recklessly in this respect," and "incurred useless costs pertaining to the handling of the extraordinary general meetings, such as costs of notices, etc." which "may also constitute recoverable damages."

- "[I]ncorrect information was provided in Oasmia's annual reports, interim reports, and offer documents from 18 March 2019."

- Oasmia's former Board of Directors inadequately administered payments, exposing the Company to risk of loss and damage, and "the incumbent Board of Directors should recover interest for the time period when the funds were unavailable to Oasmia due to late payment."

- The former board's minutes and related documentation did not meet the requirements set out in ABL.

- Money has been transferred to Alceco and then returned to Oasmia on a monthly basis, leaving Oasmia in possession of "this money for a few days every month." The transfers violated the ABL's loan prohibition rules, as both Julian Aleksov and Bo Cederstrand at the time in question were members of Oasmia's Board of Directors *and* ultimately controlled Alceco. Moreover, the handling of the transactions "also likely constitute bookkeeping crime" for which any or all of Oasmia's then Board members and the then-CEO may be liable for damages and/or have criminal liability for. Oasmia's foregone interest income "most likely constitutes so-called unlawful value transfers."

- Aleksov and Cederstrand forced Oasmia to acquire a patent application from Ardenia that the Company already owned the rights to. In addition, the payment the Board authorized was not paid to Ardenia, but instead to Aleksov and Cederstrand's creditor.

- "[I]incorrect information has been provided in annual reports, interim reports, and offer documents" "at least since the end of 2016."

- Oasmia may have to pay additional taxes and tax surcharges as a result of the ongoing tax audit, which the former Board of Directors may be liable for. In addition, based on the tax audit that was carried out between 2014-2016, the Swedish Tax Agency's assessment was that Oasmia had not been in compliance with the Swedish Accounting Act.

- 46 -

- "[T]here is a risk that [Aleksov] has placed his own and Alceco's interests above Oasmia's for the work that the Advisor has provided to the parties involved. Other Board members should also have noticed the conflict of interest."

- Two invoices from Ardenia were submitted to Oasmia in 2010 referencing "patent costs." However, Ardenia did not have any expenses for patents. The Deloitte Report noted that the submission of the invoices may constitute fraud or gross fraud, and may lead to criminal liability for disloyalty to principal or gross disloyalty to principal.

- Oasmia's advance repayment to MGC exposed the Company to the risk of loss and damage, given Company's overextended liquidity at the time of advance repayment.

233.    The Deloitte Report recommended that "each of the former Board members should be denied discharge of liability at the annual general meeting" in "order to enable Oasmia's claim for these damages against the Board members who participated in the decisions."

234.    At Oasmia's September 26, 2019 Annual Shareholders' Meeting, Oasmia's new management followed Deloitte's recommendation, except with respect to Mikael Asp, thereby adopting its conclusions.

235.    Aleksov and Cederstand's misconduct had drained Oasmia of the cash it needed to fund the commercialization of its products. As of July 30, 2019, its current liabilities exceeded its current assets. The concealed misconduct left Oasmia no choice but to seek additional funding. Accordingly, on October 14, 2019, Oasmia publicly proposed a rights offering of SEK 400 million. The rights offering left investors with the poor choice of either putting additional capital into Oasmia or seeing their ownership diluted.

236.    On October 14, 2019, the price of Oasmia's ADSs fell from $1.93 to $1.75, falling again to $1.46 on October 15, for a total two-day drop of 24%, damaging investors.

## VIII.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A.    Additional Thefts

237.    Oasmia hired Ardenia to assist in patent prosecution.

- 47 -

238.     In 2010, Ardenia issued two invoices to Oasmia, each for SEK 600,000. Oasmia paid each invoice.

239.     In fact, Ardenia's arrangement with the firms prosecuting the patents provided that the firms would bill Oasmia directly for any patent costs. Oasmia had already paid for the services. Ardenia thus simply stole SEK 1.2 million by presenting a receipt as an invoice.

240.     As of November 2018, Arwidsro had already obtained a judgment hypothecating the MGC loan. In any case, no payment under Oasmia's loans to MGC were due until August 24, 2019.

241.     Nevertheless, on November 27, 2018, Oasmia paid MGC SEK 7 million, purportedly pursuant to the MGC loan. The payment left Oasmia with only SEK 7.6 million in liquid assets as of January 31, 2019.

**B.     Oasmia's Board Minutes Show the Board Rubberstamped Aleksov and Cederstrand's Decisions**

239.     The Swedish Companies Act requires that minutes be kept at all Board meetings and that these minutes be numbered chronologically and retained.

240.     The minutes kept by the old Board were very brief. The minutes' brevity indicates that the old Board entered into resolutions without discussing or understanding their risks and benefits. Instead, the old Board rubberstamped the minutes.

241.     Further, the archived Board minutes did not include material appendices and other materials, and there were flaws in the chronological numbering, and signatures of the minutes are often copied signature pages with no dates.

242.     Boards must approve the minutes of previous meetings. The board members were presented with obviously deficient minutes but approved them anyway.

- 48 -

## IX.    DEFENDANTS' FALSE STATEMENTS

243.    On October 27, 2015, Oasmia filed a Prospectus with the SEC for the IPO of its ADSs ("Prospectus").

244.    The Prospectus stated that Oasmia had available to it "one unutilized credit facility of SEK 40 million with Alceco," repeating the statement in substantially similar words three times.

245.    These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

246.    The Prospectus also reported that Oasmia had earned interest of 210,000, and 192,000, in the years ended April 30, 2015, and 2014, respectively. These statements were misleading for failing to disclose that Oasmia would have earned materially more without the Cash Sweeps, as set out in ¶¶47-77, above.

247.    The Prospectus, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

248.    As to internal controls, the Prospectus reported:

**Internal control over financial reporting**

In connection with the audit of our financial statements as of and for the fiscal years ended April 30, 2015 and April 30, 2014 our independent registered public accounting firm reported to our audit committee that it had identified a material weakness in our internal control over financial reporting related to inadequate financial statement preparation and review procedures. Under standards established by the Public Company Accounting Oversight Board (United States), a material weakness is a deficiency or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Specifically, our independent registered public accounting firm determined that we did not have adequate procedures and controls to ensure that accurate financial statements could be prepared and reviewed on a timely basis, including:

- sufficient resources and processes in place, including controls in the finance and accounting department, to adequately perform a timely financial statement close process resulting in errors in period-end accruals related to capitalized research and development expenses.

- adequate internal review processes in place over critical accounting areas including timely operation whereby management identifies and resolves significant or complex accounting matters.

As a result of this material weakness, we plan to:

- continue improving necessary procedures to capture all expenses for capitalized research and development expenses;

- further enhance the internal review processes of critical and significant accounting areas by involving the management group deeper in such judgments and estimates;

- strengthened the finance department by recruitments and organizational change and by hiring additional personnel;

- improve know how of IFRS standards, as adopted by the IASB, through additional education in IFRS standards and also specific SEC reporting in the U.S.;

- continue implementing and improving formalized written policies and procedures for the timely accrual of capitalized research and development expenses;

- enhance oversight procedures in an effort to ensure that the accrual process has been performed prior to finalization of the financial statements at each reporting period; and

- formalize accounting evaluation of non-routine judgments and estimations.

We concurred with the findings of our independent registered public accounting firm. ***We are working to remediate the material weakness.*** []

249.    The emphasized portion of the statement was false because Defendants were not working to remediate the material weaknesses in internal controls. Oasmia's material weaknesses in its internal controls principally resulted from members of management (Aleksov and Cederstrand) circumventing ordinary practices in order to misappropriate Oasmia's assets. Management could, if it wished, remediate the material weakness in internal controls simply by stopping its misconduct, yet Aleksov and Cederstrand did not do so. Hence, Oasmia was not "working" to remediate its material weaknesses over internal controls, but instead perpetuating

- 50 -

them. Further, the statements were misleading for omitting to disclose that Oasmia violated the Recording, Access, Approval, and Bookkeeping Provisions, all of which are requirements of internal controls.

250.    The Prospectus also included E&Y's report on Oasmia's financial statements for the year ended April 30, 2015 ("2015 Audit Report"), which provided in relevant part:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Oasmia Pharmaceutical AB

We have audited the accompanying consolidated statements of financial position of Oasmia Pharmaceutical AB as of April 30, 2015 and 2014, and the related consolidated statements of income, comprehensive income, changes in equity and cash flows for each of the two years in the period ended April 30, 2015.[]

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances[] We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Oasmia Pharmaceutical AB at April 30, 2016, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended April 30, 2016, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board**.**

[]


/s/ Ernst & Young AB
Ernst & Young AB

- 51 -

251.     This statement was false and misleading because as set out in ¶¶133-175, above: (1) E&Y was reckless in not knowing that Oasmia's financial statements contained numerous false and misleading statements, (2) E&Y's audit did not comport with PCAOB Standards, and (3) E&Y had not taken Oasmia's poor internal controls into account in designing audit procedures.

252.     On December 4, 2015, Oasmia filed with the SEC its Interim Report for its quarter ending October 31, 2015 ("Q2 2016 6-K").

253.     Defendant Aleksov signed the Q2 2016 6-K. Defendants Aleksov, Cederstrand, Domdey, Kotsinas, Liljeblad, Bergkvist, and Asp each attested to the Q2 2016 6-K's accuracy.

254.     The Q2 2016 6-K provided, in relevant part:

> On October 31, 2015 Oasmia had a credit facility of TSEK 40,000, same amount as of October 31, 2014, provided by the principal shareholder of the company, Alceco International S.A. The interest rate on utilized credits is 5 %. As of October 31, 2015, TSEK 35 of this credit was utilized.

255.     These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

256.     The Q2 2016 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

257.     On March 3, 2016, Oasmia filed with the SEC its Interim Report for its fiscal quarter beginning ending January 31, 2016 ("Q3 2016 6-K").

258.     Defendant Aleksov signed the Q3 2016 6-K. Defendants Aleksov, Cederstrand, Domdey, Kotsinas, Liljeblad, Bergkvist, and Asp attested to the Q3 2016 6-K's accuracy.

259.     The Q3 2016 6-K provided, in relevant part:

- 52 -

As of January 31, 2016, unutilized credit facilities with a bank amounted to TSEK 5,000, which is the same amount as of January 31, 2015 and with the principal owner Alceco International S.A, TSEK 39,965, compared to TSEK 40,000 as of January 31, 2015.

. . .

On January 31, 2016 Oasmia had a credit facility of TSEK 40,000, which is the same amount as of January 31, 2015, provided by the principal shareholder of the company, Alceco International S.A. The interest rate on utilized credits is 5%. As of January 31, 2016, TSEK 35 of this credit was utilized, compared to 0 as of January 31, 2015.

260.    These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

261.    The Q3 2016 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

262.    On April 25, 2016, Oasmia announced the completion of a private placement of convertible bonds ("April 2016 Bond 6-K").

263.    Defendant Aleksov signed the April 2016 Bond 6-K.

264.    The April 2016 Bond 6-K provided, in relevant part:

[O]n April 14, 2016 in which it issued convertible notes (the "Notes") in the aggregate amount of SEK 28 million (approximately USD 3.5 million) carrying an interest rate of 8.5%, as well as 1,666,666 of its ordinary shares (the "Shares"). The Shares sold in the Private Placement are referred to herein as the "Purchased Shares." The Notes and the Purchased Shares were purchased by institutional and qualified investors in Sweden. Pursuant to the Private Placement, Oasmia issued 28 Notes, each in the principal face amount of SEK 1,000,000 (approximately USD 123,000), and 1,666,666 Purchased Shares at a price per Share of SEK 10.50 per such Share (approximately USD 1.30 per Share).

. . .

> The Notes are convertible into Shares at a rate of SEK 11.70 (approximately USD 1.44), which rate is based on the closing price of Oasmia's Shares on Nasdaq Stockholm on April 14, 2016. The term of the Notes is one year, unless earlier converted or prepaid. The subscription price of SEK 10.50 for the Purchased Shares reflects a discount of approximately 10.3% based on the closing price of the Shares on Nasdaq Stockholm on April 14, 2016.

265.   This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand.  The statements were further misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

266.   On June 3, 2016, Oasmia filed its Annual Report for the year ended April 30, 2016 ("2016 Annual Report").

267.   Defendant Aleksov signed the 2016 Annual Report. Defendants Aleksov, Cederstrand, Domdey, Kotsinas, Liljeblad, Bergkvist, and Asp attested to the 2016 Annual Report's accuracy.

268.   The 2016 Annual Report provided, in relevant part:

> As of April 30, 2016, unutilized credit facilities with a bank amounted to TSEK 5,000, which is the same amount as of April 30, 2015 and with the principal owner Alceco International S.A, TSEK 40,000, compared to TSEK 40,000 as of April 30, 2015.
>
> . . .
>
> On April 30, 2016 Oasmia had a credit facility of TSEK 40,000, which is the same amount as of April 30, 2015, provided by the principal shareholder of the company, Alceco International S.A. The interest rate on utilized credits is 5%. TSEK 35 of this borrowing opportunity was utilized during

part of the fiscal year, but as of April 30, 2016, it was completely unutilized, as was the case as of April 30, 2015.

269.    These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

270.    The Annual Report, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

271.    On June 10, 2016, Oasmia announced the completion of a private placement of convertible bonds ("June 2016 Bond 6-K").

272.    Defendant Aleksov signed the June 2016 Bond 6-K.

273.    The June 2016 Bond 6-K provided, in relevant part:

> [O]n June 9, 2016 in which it issued convertible notes (the "Notes") in the aggregate amount of SEK 42 million (approximately USD 5 million) carrying an interest rate of 8.5%. The Notes were purchased by institutional and qualified investors in Sweden. Pursuant to the June Private Placement, Oasmia issued 42 Notes, each in the principal face amount of SEK 1,000,000 (approximately USD 120,000).
>
> . . .
>
> The Notes are convertible into ordinary shares (the "Shares") at a conversion rate of SEK12.00 per share), which rate is based on the closing price of Oasmia's Shares on Nasdaq Stockholm on June 8, 2016. The term of the Notes is one year, unless earlier converted or prepaid.

274.    This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand.   The statements were further

- 55 -

misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

275.    On July 8, 2016 and July 29, 2016, Oasmia filed two Post-Effective Amendments to its IPO Registration Statement ("Post-Effective Amendments").

276.    Defendants Aleksov and Asp signed each of the Post-Effective Amendments.

277.    The Post-Effective Amendments each provided, in relevant part:

On April 30, 2016 we had the following loans and credit lines: […] (v) one unutilized credit facility of SEK 40 million with Alceco, with a fixed interest rate of 5% upon utilization.

. . .

The credit facility available to us from Alceco on SEK 40 million carries a fixed interest rate of 5 % on utilization, and therefore does not entail any interest rate risk. A credit facility available to us from a Swedish bank for SEK 5 million will carry a variable interest rate, based upon STIBOR upon utilization. The loan from Nexttobe on SEK 94.4 million carries a fixed interest of 8.5% for 2016.

. . .

Alceco has made a credit facility of SEK 40 million available to us. The credit facility is valid until December 2016, and is renewed automatically for one-year terms, unless terminated by either party at least three months prior to an expiration date. As of June 30, 2016, this credit facility is completely unutilized. The interest rate on any utilized credit amount is 5%.

. . .

In addition to this loan, Oasmia also has a loan commitment of TSEK 40,000 as of April 30, 2016 compared to TSEK 40,000 as of April 30, 2015 and April 30, 2014 respectively, from the largest shareholder, Alceco International S.A. None of this loan commitment has been made use of.

. . .

On April 30, 2016 there was a credit facility of TSEK 40,000 compared to TSEK 40,000 as if April 30, 2015 and April 30, 2014 respectively, available to Oasmia from Alceco International S.A., the company's largest shareholder. If the facility is utilized the interest rate is 5%. This credit

- 56 -

facility was utilized to the tune of TSEK 35 during part of the financial year but at April 30, 2016 this credit facility was completely unused, as was the case at April 30, 2015 and April 30, 2014.

278.    These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

279.    The Post-Effective Amendments also reported that Oasmia had earned interest of SEK 786,000, 56,000, and 192,000 in the years ended April 30 2016, 2015, and 2014, respectively. These statements were misleading for failing to disclose that Oasmia would have earned materially more interest had Aleksov and Cederstrand not skimmed the interest from Oasmia's cash, as set out in ¶¶47-77, above.

280.    The Post-Effective Amendments also stated that "In June 2016, Oasmia has issued 42 convertibles at a nominal price of SEK 1,000,000 per convertible note, which provided the company with SEK 42 million, or $4.98 million, before deducting issue costs."

281.    This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand.   The statements were further misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

282.    The Post-Effective Amendments also stated, in relevant part:

In connection with the audit of our financial statements as of and for the fiscal year ended April 30, 2015, 2014 our independent registered public accounting firm reported to our audit committee that it had identified a material weakness in our

- 57 -

internal control over financial reporting related to inadequate financial statement preparation and review procedures. During the year ended April 30, 2016, we have performed the remedial activities described below to address the material weakness identified by our independent registered public accounting firm. However there has not yet been a sufficient time period to allow management to assess whether these actions have been implemented successfully, and determine that the newly-designed controls will operate as designed, both routinely and effectively. Accordingly, we cannot yet conclude that the material weakness previously identified has been fully remediated. Under standards established by the Public Company Accounting Oversight Board (United States), a material weakness is a deficiency or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Specifically, our independent registered public accounting firm determined that we did not have adequate procedures and controls to ensure that accurate financial statements could be prepared and reviewed on a timely basis, including:

- sufficient resources and processes in place, including controls in the finance and accounting department, to adequately perform a timely financial statement close process resulting in errors in period-end accruals related to capitalized research and development expenses.

- adequate internal review processes in place over critical accounting areas including timely operation whereby management identifies and resolves significant or complex accounting matters.

As a result of this material weakness, during the financial year 2015/2016 we have implemented the following changes:

- continued to improve necessary procedures to capture all expenses for capitalized research and development expenses;

- further enhance the internal review processes of critical and significant accounting areas by involving the management group deeper in such judgments and estimates;

- strengthened the finance department by recruitments and organizational change and by hiring additional personnel;

- improved know how of IFRS standards, as adopted by the IASB, through additional education in IFRS standards and also specific SEC reporting in the U.S.;

- Continued to implement and improve formalized written policies and procedures for the timely accrual of capitalized research and development expenses;

- enhanced oversight procedures in an effort to ensure that the accrual process has been performed prior to finalization of the financial statements at each reporting period; and

- formalized accounting evaluation of non-routine judgments and estimations.

We concurred with the findings in the previous fiscal year from our independent registered public accounting firm. ***We have been working to remediate the material weakness.***

283.     The emphasized portion of the statement was false because Defendants were not working to remediate the material weaknesses in internal controls. Oasmia's material weaknesses in its internal controls principally resulted from members of management (Aleksov and Cederstrand) circumventing ordinary practices in order to misappropriate Oasmia's assets. Management could, if it wished, remediate the material weakness in internal controls simply by stopping its misconduct, yet Aleksov and Cederstrand did not do so. Hence, Oasmia was not "working" to remediate its material weaknesses over internal controls, but instead perpetuating them. Further, the statements were misleading for omitting to disclose that Oasmia violated the Recording, Access, Approval, and Bookkeeping Provisions, all of which are requirements of internal controls.

284.     The Post-Effective Amendments, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

285.     The 2016 20-F also included E&Y's report on Oasmia's financial statements for the year ended April 30, 2016 ("2015 Audit Report"), which provided in relevant part:

**REPORT     OF     INDEPENDENT     REGISTERED     PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Oasmia Pharmaceutical AB

We have audited the accompanying consolidated statements of financial position of Oasmia Pharmaceutical AB as of April 30, 2016, 2015 and 2014, and the related consolidated statements of income, comprehensive income, changes in equity and cash flows for each of the three years in the period ended April 30, 2016.[]

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances[] We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Oasmia Pharmaceutical AB at April 30, 2016, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended April 30, 2016, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.

[]


/s/ Ernst & Young AB
Ernst & Young AB

286.    This statement was false and misleading because as set out in ¶¶133-175, above:

(1) E&Y was reckless in not knowing that Oasmia's financial statements contained numerous false and misleading statements, (2) E&Y's audit did not comport with PCAOB Standards, and (3) E&Y had not taken Oasmia's poor internal controls into account in designing audit procedures.

287.    On August 26, 2016, Oasmia filed its 20-F for the year ended April 30, 2016 ("2016 20-F").

288.    Defendant Asp signed the 2016 20-F and Defendants Asp and Aleksov certified its accuracy pursuant to SOX.

289.    The 2016 20-F made the same false statements as the Post-Effective Amendments, which were false or misleading for the same reasons.

290.    Defendants Asp and Aleksov also both filed SOX certifications, which stated in relevant part:

- 60 -

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report

the company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures […] and internal control over financial reporting […] for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

010837-11/1209285 V1

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

291. The statements were false because: (a) as set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, above, the 2016 20-F and its financial statements contained numerous false statements; (b) as set out in ¶¶47-77, 79-94, 96-113, and 115-126, Defendants had not designed internal controls or disclosure controls that met the standards set out in their certification, in that the internal controls allowed Defendants to abscond with the Company's cash every single month and skim interest thereon, failed to ensure that transactions were properly recorded, and failed to ensure that the basis of the Board's actions was properly recorded, among other things; and (c) the Defendants did not disclose to Oasmia's audit committee and/or auditor the frauds set out in ¶¶47-77, 79-94, 96-113, and 115-126, above.

292. On September 7, 2016, Oasmia filed with the SEC its report for the quarter ended July 31, 2016 ("Q1 2017 6-K").

293. Defendant Blom signed the Q1 2016 6-K. Defendants Aleksov, Cederstrand, Domdey, Kotsinas, Liljeblad, Bergkvist, Asp attested to the Q1 2016 6-K's accuracy.

294. The Q1 2017 6-K provided, in relevant part:

As of July 31, 2016, unutilized credit facilities with a bank amounted to TSEK 5,000, which is the same amount as of July 31, 2015 and with the principal owner Alceco International S.A, TSEK 40,000, compared to TSEK 40,000 as of July 31, 2015.

. . .

On July 31, 2016 Oasmia had a credit facility of TSEK 40,000, which is the same amount as of July 31, 2015, provided by the principal shareholder of the company, Alceco International S.A. The interest rate on utilized credits is 5%. As of July 31, 2016, it was completely unutilized, as was the case as of July 31, 2015.

- 62 -

295.    These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

296.    The Q1 2017 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

297.    On October 25, 2016, Oasmia announced the completion of a private placement of convertible bonds ("October 2016 Bond 6-K").

298.    Defendant Aleksov signed the October 2016 Bond 6-K.

299.    The June 2016 Bond 6-K provided, in relevant part:

> The private placement, which was announced on October 21, 2016, has enabled Oasmia to place 8,750,000 new shares with professional and qualified investors at a price of SEK 8.00 per share through an accelerated book building procedure.
>
> . . .
>
> In order to enable the private placement, the Board of Directors of Oasmia has, pursuant to the authorization granted by the annual general meeting held on September 26, 2016, resolved on a directed issue of 8,750,000 new shares. The reason for deviating from the shareholders' preferential rights by conducting a directed new share issue is to broaden the shareholder base, and that the costs and timing of the procedure collectively, and with sufficient strength, indicate that it is in the Company's, and thus the shareholders', interest that the issue is made with deviation from the shareholders' preferential rights.

300.    This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand.   The statements were further

- 63 -

misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

301.   On December 5, 2016, Oasmia filed with the SEC its interim report for the quarter ended October 31, 2016 ("Q2 2017 6-K").

302.   Defendant Blom signed the Q2 2017 6-K. Defendants Aleksov, Cederstrand, Bergkvist, Kotsinas, and Asp attested to Q2 2016 6-K's accuracy.

303.   The Q2 2017 6-K provided, in relevant part:

> As of October 31, 2016, unutilized bank credit facilities amounted to TSEK 5,000, which is the same amount as of October 31, 2015 and unutilized credit facilities with the principal owner Alceco International S.A, TSEK 40,000, compared to TSEK 39,965 as of October 31, 2015.
>
> . . .
>
> On October 31, 2016 Oasmia had a credit facility of TSEK 40,000, which is the same amount as of October 31, 2015, provided by the principal shareholder of the company, Alceco International S.A. The interest rate on utilized credits is 5 percent. As of October 31, 2016, it was completely unutilized. On October 31, 2015 TSEK 35 was utilized.

304.   These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

305.   The Q2 2017 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

306.   On March 3, 2017, Oasmia filed its interim Report for the quarter ended January 31, 2017 ("Q3 2017 6-K").

307.    Defendant Blom signed the Q3 2017 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, and Asp attested to the Q3 2017 6-K's accuracy

308.    The Q3 2017 6-K provided, in relevant part:

> As of January 31, 2017, unutilised bank credit facilities amounted to TSEK 5,000, which is the same amount as of January 31, 2016, and unutilised credit facilities with the principal owner Alceco International S.A. amounted to TSEK 40,000 compared to TSEK 39,965 as of January 31, 2016.
>
> . . .
>
> On January 31, 2017, Oasmia had a credit facility of TSEK 40,000 which is the same amount as of January 31, 2016, provided by the principal shareholder of the Company, Alceco International S.A. The interest rate on utilised credit is 5 percent. As of January 31, 2017, it was completely unutilised. As of January 31, 2016, TSEK 35 was utilised.

309.    These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

310.    The Q3 2017 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

311.    On June 9, 2017, Oasmia filed with the SEC its Annual Report for the year ended April 30, 2017 ("2017 Annual Report").

312.    Defendant Blom signed the 2017 Annual Report. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, and Asp all attested to the 2017 Annual Report's accuracy.

313.    The 2017 Annual Report provided, in relevant part:

> On April 30, 2017, Oasmia had a credit facility of TSEK 40,000 which is the same amount as per April 30, 2016, provided by the principal shareholder of the company, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of April 30, 2017, it was completely unutilized, which was also the case as of April 30, 2016.

314.    These statements and other similar statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

315.    The 2017 Annual Report provided, in relevant part:

**Financial position**

The consolidated liquid assets at the end of the financial year totalled TSEK 28,001 compared to TSEK 26,208 at the end of the previous financial year. As of April 30, 2017, the company has TSEK 0 invested in short-term interest funds, of which TSEK 0 is frozen as security for a bank loan. As of April 30, 2016, the company had TSEK 20,006 invested in short-term interest funds, of which TSEK 20,000 was frozen as security for a bank loan.

316.    The 2017 Annual Report also reported that Oasmia had earned interest of SEK 786,000, and 92,000 in the years ended April 30, 2016 and April, 30 2017, respectively. These statements were misleading for failing to disclose that Oasmia would have earned materially more interest had Aleksov and Cederstrand not skimmed the interest from Oasmia's cash, as set out in ¶¶47-77, above.

317.    The 2017 Annual Report also made several statements describing the issuances of convertible loans, which were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand. The statements were further misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

318.    The 2017 Annual Report, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶47-77, above.

319.    On August 24, 2017, Oasmia filed its 20-F for the year ended April 30, 2017 ("2017 20-F").

320.    Defendant Asp signed the 2017 20-F and Defendants Asp and Gynnerstedt certified its accuracy pursuant to SOX.

321.    The 2017 20-F made the same statements as the 2017 Annual Report, which were false for the same reasons.

322.    In addition to statements made in the 2017 Annual Report, the 2017 20-F stated that in the year ended April 30, 2017, Aleksov's total compensation was SEK 2,814,000 and Bo Cederstrand's total compensation was SEK 175,000. This statement was false because as set out in ¶¶ 115-126, above, in addition to their approved compensation, Aleksov and Cederstrand were awarded warrants under the guise of subscribing to convertible loans.

323.    The 2017 20-F also stated, in relevant part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control— Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on those criteria, management concluded that, as of April 30, 2017, our internal control over financial reporting was not effective due to the existence of the material weaknesses described below.

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis. In connection with the audit and the preparation of the consolidated financial statements as of and for the year ended April 30, 2017, our independent registered public accounting firm reported to our audit committee that it had identified a material weakness in our internal control over financial reporting related to inadequate financial statement preparation and review procedures, specifically, our independent registered public accounting firm

determined that we did not have adequate procedures and controls to ensure that accurate financial statements could be prepared and reviewed on a timely basis, including:

- sufficient resources and processes in place, including controls in the finance and accounting department, to adequately perform a timely financial statement close process resulting in errors in period-end accruals related to capitalized research and development expenses.

- adequate internal review processes in place over critical accounting areas including timely operation whereby management identifies and resolves significant or complex accounting matters."

We concurred with the findings from our independent registered public accounting firm. *We are in the process of remediating* […]

324.    The emphasized portion of the statement was false because Defendants were not working to remediate the material weaknesses in internal controls. Oasmia's material weaknesses in its internal controls principally resulted from members of management (Aleksov and Cederstrand) circumventing ordinary practices in order to misappropriate Oasmia's assets. Management could, if it wished, remediate the material weakness in internal controls simply by stopping its misconduct, yet Aleksov and Cederstrand did not do so. Hence, Oasmia was not "working" to remediate its material weaknesses over internal controls, but instead perpetuating them. Further, the statements were misleading for omitting to disclose that Oasmia violated the Recording, Access, Approval, and Bookkeeping Provisions, all of which are requirements of internal controls.

325.    The 2017 20-F also included E&Y's report on Oasmia's financial statements for the year ended April 30, 2017 ("2017 Audit Report"), which provided in relevant part:

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders of Oasmia Pharmaceutical AB

We have audited the accompanying consolidated statements of financial position of Oasmia Pharmaceutical AB as of April 30, 2017, 2016 and 2015, and the related consolidated statements of income, comprehensive income, changes in equity and cash flows for each of the three years in the period ended April 30, 2017.[]

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances[] We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Oasmia Pharmaceutical AB at April 30, 2016, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended April 30, 2016, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board**.**

[]

/s/ Ernst & Young AB
Ernst & Young AB

326.    This statement was false and misleading because as set out in ¶¶133-175, above:

(1) E&Y was reckless in not knowing that Oasmia's financial statements contained numerous false and misleading statements, (2) E&Y's audit did not comport with PCAOB Standards, and (3) E&Y had not taken Oasmia's poor internal controls into account in designing audit procedures.

327.    Defendants Asp and Gynnerstedt also both filed SOX certifications, which stated in relevant part:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures […] and internal control over financial reporting […] for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

328.   The statements were false because: (a) as set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, above, the 2017 20-F and its financial statements contained numerous false statements; (b) as set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, above, Defendants had not designed internal controls or disclosure controls that met the standards set out in their certification, in that the internal controls allowed Defendants to abscond with the Company's cash every single month and skim interest thereon, failed to ensure that transactions were properly recorded, and failed to ensure that the basis of the Board's actions was properly recorded, among other things; and (c) the Defendants did not disclose to Oasmia's audit committee and/or auditor the frauds set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, above.

329.   On September 5, 2017, Oasmia filed with the SEC its interim report for the quarter ended July 31, 2017" ("Q1 2018 6-K").

330.   Defendant Blom signed the Q1 2018 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, and Asp attested to the Q1 2018 6-K's accuracy.

331.   The Q1 2018 6-K provided, in relevant part:

Unutilized bank credit facilities at the end of the quarter amounted to TSEK 5,000 with a bank compared to TSEK 5,000 in the first quarter previous year and TSEK 40,000 with the principal owner Alceco International S.A. compared to TSEK 40,000 in the first quarter previous year.

. . .

At July 31, 2017, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 in the first quarter previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of July 31, 2017, it was completely unutilized, which was also the case as of July 31, 2016.

- 71 -

332.    These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

333.    The Q1 2018 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above

334.    On December 7, 2017, Oasmia filed with the SEC its interim report for the quarter ended ("Q2 2018 6-K").

335.    Defendant Blom signed the Q2 2018 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, and Asp attested to the Q2 2018 6-K's accuracy.

336.    The Q2 2018 6-K provided, in relevant part:

> Unutilized bank credit facilities at the end of the quarter amounted to TSEK 5,000 with a bank compared to TSEK 5,000 at the end of the second quarter the previous year and TSEK 40,000 with the principal owner Alceco International S.A. compared to TSEK 40,000 at the end of the second quarter the previous year.
>
> . . .
>
> At October 31, 2017, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 at the end of the second quarter the previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of October 31, 2017, it was completely unutilized, which was also the case as of October 31, 2016.

337.    These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

- 72 -

338.    The Q2 2018 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above.

339.    On December 7, 2017, Oasmia announced the completion of a private placement of convertible bonds ("December 2017 Bond 6-K").

340.    Defendant Blom signed the December 2017 Bond 6-K.

341.    The December 2017 Bond 6-K provided, in relevant part:

> The Private Placement has enabled Oasmia to place 28 new convertible instruments with a limited group of investors at a nominal value of SEK 1,000,000 per convertible instrument through an accelerated book building procedure.
>
> . . .
>
> The convertible instruments have been subscribed at 100 per cent of the nominal amount and the convertible loan bear an interest rate of 8 per cent per year. The conversion rate is based on the closing price of Oasmia's shares on Nasdaq Stockholm on 29 November with premium and will amount to SEK 3.10. The term of the loan is approximately one year with a maturity date on 30 November 2018 if not converted to shares earlier. The terms of the convertible instruments are based on the accelerated book building procedure on 29 November 2017 and the Board of Directors has thereby ensured that the terms of the convertible instruments corresponds to fair market standards.

342.    This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand. The statements were further misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

343.    On March 6, 2018, Oasmia filed with the SEC its interim report for the quarter ended January 31, 2018 ("Q3 2018 6-K").

344.    Defendant Blom signed the Q3 2018 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, Langö, and Asp attested to Q3 2018 6-K's accuracy.

345.    The Q3 2018 6-K provided, in relevant part:

> Unutilized bank credit facilities at the end of the quarter amounted to TSEK 5,000 with a bank compared to TSEK 5,000 at the end of the third quarter the previous year and TSEK 40,000 with one of the principal owners Alceco International S.A. compared to TSEK 40,000 at the end of the third quarter the previous year.

> At January 31, 2018, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 at the end of the third quarter the previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of January 31, 2018, it was completely unutilized, which was also the case as of January 31, 2017.

346.    These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

347.    The Q3 2018 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above.

348.    On April 20, 2018, Oasmia announced the completion of a private placement of convertible bonds ("April 2018 Bonds 6-K").

349.    Defendant Blom signed the April 2018 Private Placement 6-K.

350.    The April 2018 Private Placement 6-K provided, in relevant part:

> The Private Placement has enabled Oasmia to place 26 new convertible instruments with a limited group of investors at a nominal value of SEK 1,000,000 per convertible instrument through an accelerated book building procedure.

- 74 -

. . .

> In order to enable the placement, the Board of Directors of Oasmia has, by virtue of the authorisation granted by the Annual General Meeting held on 25 September, 2017, resolved on a directed issue of a new convertible loan in the amount of SEK 26,000,000. The convertible instruments have been subscribed at 100 per cent of the nominal amount and the convertible loan bear an interest rate of 8 per cent per year. The conversion rate is based on the closing price of Oasmia's shares on Nasdaq Stockholm on 18 April 2018 with premium and will amount to SEK 4.90. The term of the loan is approximately one year with a maturity date on 22 April 2019 if not converted to shares earlier. The terms of the convertible instruments are based on an accelerated book building procedure on 18 April 2018 and the Board of Directors has thereby ensured that the terms of the convertible instruments corresponds to fair market standards.

351.     This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand. The statements were further misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

352.     On April 30, 2018, Oasmia filed a Form F-3 ("April 2018 F-3").

353.     Defendants Asp, Aleksov, and Blom signed the April 2018 F-3.

354.     The April 2018 F-3 stated, in relevant part:

> In connection with the audit of our financial statements as of and for the fiscal years ended April 30, 2017 and 2015, our independent registered public accounting firm reported to our audit committee that it had identified a material weakness in our internal control over financial reporting related to inadequate financial statement preparation and review procedures. Under standards established by the Public Company Accounting Oversight Board (United States), a material weakness is a deficiency or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Specifically, our independent registered public

- 75 -

accounting firm determined that we did not have adequate procedures and controls to ensure that accurate financial statements could be prepared and reviewed on a timely basis, including:

- sufficient resources and processes in place, including controls in the finance and accounting department, to adequately perform a timely financial statement close process resulting in errors in period-end accruals related to capitalized research and development expenses.

- adequate internal review processes in place over critical accounting areas including timely operation whereby management identifies and resolves significant or complex accounting matters.

As a result of this material weakness, during the year ended April 30, 2017 and 2015 we will continue to implement the following changes:

- continued to improve necessary procedures to capture all expenses for capitalized research and development expenses;

- further enhanced the internal review processes of critical and significant accounting areas by involving the management group deeper in such judgments and estimates;

- strengthened the finance department by recruitments and organizational change and by hiring additional personnel;

- improved know how of IFRS standards, as adopted by the IASB, through additional education in IFRS standards and also specific SEC reporting in the U.S.;

- Continued to implement and improve formalized written policies and procedures for the timely accrual of capitalized research and development expenses;

- enhanced oversight procedures in an effort to ensure that the accrual process has been performed prior to finalization of the financial statements at each reporting period; and

- formalized accounting evaluation of non-routine judgments and estimations.

We concurred with the findings in the years ended April 30, 2017 and 2015 from our independent registered public accounting firm. ***We will continue to work to remediate the material weakness.*** We will continue to strengthen our processes, however our initiatives may not prove to be successful to avoid any material weakness in the future.

355.    The emphasized portion of the statement was false because Defendants were not

working to remediate the material weaknesses in internal controls. Oasmia's material weaknesses

in its internal controls principally resulted from members of management (Aleksov and

- 76 -

Cederstrand) circumventing ordinary practices in order to misappropriate Oasmia's assets. Management could, if it wished, remediate the material weakness in internal controls simply by stopping its misconduct, yet Aleksov and Cederstrand did not do so. Hence, Oasmia was not "working" to remediate its material weaknesses over internal controls, but instead perpetuating them. Further, the statements were misleading for omitting to disclose that Oasmia violated the Recording, Access, Approval, and Bookkeeping Provisions, all of which are requirements of internal controls.

356.    On June 8, 2018, Oasmia filed its Annual Report for the year ended April 30, 2018 ("2018 Annual Report").

357.    Defendant Blom signed the 2018 Annual Report. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, Langö, and Asp attested to the 2018 Annual Report's accuracy

358.    The 2018 Annual Report provided, in relevant part:

> Unutilized bank credit facilities at the end of the year amounted to TSEK 5,000 with a bank compared to TSEK 5,000 at the end of the fourth quarter the previous year and TSEK 40,000 with one of the principal owners, Alceco International S.A., compared to TSEK 40,000 at the end of the fourth quarter the previous year.

> At April 30, 2018, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 at the end of the fourth quarter the previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of April 30, 2018, it was completely unutilized, which was also the case as of April 30, 2017.

359.    These statements were misleading for failing to disclose that Alceco's only assets were Oasmia shares and that, as a result, there was a risk that the Credit Commitment would not be available in an emergency. See ¶¶ 96-113, above.

360.    The 2018 Annual Report also reported that Oasmia had earned interest of 92,000 and 101,000 in the years ended April 30, 2017 and April 30, 2018, respectively. This statement was misleading for failing to disclose that Oasmia would have earned materially more interest

had Aleksov and Cederstrand not skimmed the interest from Oasmia's cash, as set out in ¶¶ 47-77, above.

361.    The Annual Report, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above

362.    On August 31, 2018, Oasmia filed with the SEC its interim report for the quarter ended July 31, 2018 ("Q1 2019 6-K").

363.    Defendant Blom signed the Q1 2019 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, Langö, and Asp attested to the Q1 2019 6-K's accuracy.

364.    The Q1 2019 6-K provided, in relevant part:

> Unutilized credit facilities at the end of the quarter amounted to TSEK 199 with a bank compared to TSEK 5,000 at the end of the first quarter the previous year and TSEK 40,000 with one of the principal owners, Alceco International S.A., compared to TSEK 40,000 at the end of the first quarter the previous year.

> At July 31, 2018, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 at the end of the first quarter the previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of July 31, 2018, it was completely unutilized, which was also the case as of July 31, 2017.

365.    These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

366.    Q1 2019 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above.

367.    On September 7, 2018, Oasmia announced the completion of a private placement of convertible bonds ("September 2018 Bond 6-K").

368.     Defendant Blom signed the September 2018 Bond 6-K.

369.     The September 2018 Bond 6-K provided, in relevant part:

> [T]he Company has completed a private placement of a convertible loan in
> the total amount of SEK 35,200,000 with an interest rate of 8 per cent per
> year directed to and placed with a limited group of investors and paid in
> cash (the "Private Placement"). The convertible instrument issue is
> expected to provide the Company with SEK 35,200,000 before transaction
> related costs. Meanwhile, the Company informs that the Board of Directors
> of Oasmia has issued and allocated 8,064,516 new shares by virtue of
> utilisation of warrants of series 2018/2019.
>
> The Private Placement has enabled Oasmia to place 32 new convertible
> instruments with a limited group of investors at a nominal value of SEK
> 1,100,000 per convertible instrument through an accelerated book building
> procedure.
>
> . . .
>
> In order to enable the placement, the Board of Directors of Oasmia has, by
> virtue of the authorisation granted by the Annual General Meeting held on
> 25 September, 2017, resolved on a directed issue of a new convertible loan
> in the amount of SEK 35,200,000. The convertible instruments have been
> subscribed at 100 per cent of the nominal amount and the convertible loan
> bear an interest rate of 8 per cent per year. The conversion rate is based on
> the closing price of Oasmia's shares on Nasdaq Stockholm on 6 September
> 2018 with premium and will amount to SEK 7.70. The term of the loan is
> approximately one year with a maturity date on 7 September 2019 if not
> converted to shares earlier. The terms of the convertible instruments are
> based on an accelerated book building procedure on 6 September 2018 and
> the Board of Directors has thereby ensured that the terms of the convertible
> instruments corresponds to fair market standards.

370.     This statement, as well as several others describing issuances of convertible loans,

were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a

portion of the convertible loans had not been and would not be paid for unless and until it was

substantially in the money; (b) in economic substance, the convertible bonds were not debt

instruments but warrant awards to Aleksov and Cederstrand. The statements were further

misleading for referring to the transaction in the past tense, when in truth the transaction would

only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

371.    On September 14, 2018, Oasmia filed its 20-F for the year ended April 30, 2018 ("2018 20-F").

372.    Defendant Asp signed the 2018 20-F and Defendants Asp and Blom certified its accuracy pursuant to SOX.

373.    The 2018 20-F provided, in relevant part:

> Alceco has also extended a credit facility of SEK 40 million to the Company.
>
> . . .
>
> On April 30, 2018 we had the following loans and credit lines: […] (v) one unutilized credit facility of SEK 40 million with Alceco, with a fixed interest rate of 5% upon utilization.
>
> . . .
>
> Alceco, Oasmia's second largest shareholder, see item 7 A Major Shareholders, has made a credit facility of SEK 40 million available to us.
>
> . . .
>
> In addition to this loan, Oasmia also has a promise of credit of [SEK 40 million] as of April 30, 2018 compared to [SEK 40 million] as of April 30, 2017 from the second largest shareholder, Alceco International S.A. […] None of the promise of credit from Alceco has been utilized.
>
> . . .
>
> On April 30, 2018 there was a credit facility of [SEK 40 million] compared to [SEK 40 million] as if April 30, 2017, available to Oasmia from Alceco International S.A., the company's second largest shareholder. If the facility is utilized the interest rate is 5%. This credit facility was completely unused at April 30, 2018, as was the case at April 30, 2017.

374.    These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

- 80 -

375.    The 2018 20-F also stated that in the year ended December 31, 2018, Aleksov's total compensation was SEK 2,838,000 and Bo Cederstrand's total compensation was SEK 175,000. This statement was false because as set out in ¶¶ 96-113, 115-126, above, in addition to their approved compensation: (a) Aleksov and Cederstrand were paid SEK 10.55 million which Defendants falsely stated was in connection with the XR-17 patent extension; (b) Aleksov and Cederstrand were awarded warrants under the guise of subscribing to convertible loans.

376.    The 2018 20-F also reported that Oasmia had earned interest of SEK 101,000, 92,000, and 786,000 in the years ended April 30 2018, 2017, and 2016, respectively. These statements were misleading for failing to disclose that Oasmia would have earned materially more interest had Aleksov and Cederstrand not skimmed the interest from Oasmia's cash, as set out in ¶¶ 47-77, above.

377.    The 2018 20-F also stated that "[o]n September 7, 2018 a convertible loan of 32 convertible instruments at a nominal value of SEK 1,100,000 per instrument, totaling SEK [35.2 million], was issued." This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand.

378.    The 2018 20-F also stated, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. A material weakness, as defined by SEC rules, is a deficiency, or combination

of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the audit and the preparation of the consolidated financial statements as of and for the year ended April 30, 2018, our independent registered public accounting firm reported to our audit committee that it had identified the following material weakness in our internal control over financial reporting, specifically in relation to insufficient processes in place, including controls in the sales/finance and accounting department, to adequately perform a timely financial statement close process resulting in errors in revenue recognition regarding profit-sharing.

As reported in our annual report on Form 20-F for the year ended April 30, 2017, our independent registered public accounting firm identified a material weakness in our internal control over financial reporting with respect to insufficient resources and processes in place, including controls in the finance and accounting department, to adequately perform a timely financial statement close process resulting in errors in period-end accruals related to capitalized research and development expenses as well as inadequate internal review processes in place over critical accounting areas including timely operation whereby management identifies and resolves significant or complex accounting matters.

Due to lack of resources, during 2018, we were unable to implement in any material respect our remediation plans for the material weaknesses identified in prior years. We intend to take appropriate and reasonable steps to make the necessary improvements to remediate these deficiencies.

As a result of the material weaknesses identified, we concluded that our internal control over financial reporting was ineffective.

Profit-sharing revenue recognition

Our independent registered public accounting firm identified a material weakness regarding the operating effectiveness of internal controls over revenue recognition. Specifically, internal controls designed to ensure that profit-sharing revenue is properly recognized were not carried out effectively. As a result, revenue was not appropriately recorded in 2018, resulting in a material misstatement which was corrected in the financial statements as of April 30, 2018. Although management corrected the misstatement for the year ended April 30, 2018, we concur with our independent registered public accounting firm that a material weakness exists in our internal control over financial reporting as of April 30, 2018.

C.  Remediation Efforts to Address Material Weakness

To remediate the material weaknesses in our internal control over financial reporting described above, ***we are implementing new control procedures to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS.***

379.    The emphasized portion of the statement was false because Defendants were not working to remediate the material weaknesses in internal controls. Oasmia's material weaknesses in its internal controls principally resulted from members of management (Aleksov and Cederstrand) circumventing ordinary practices in order to misappropriate Oasmia's assets. Management could, if it wished, remediate the material weakness in internal controls simply by stopping its misconduct, yet Aleksov and Cederstrand did not do so. Hence, Oasmia was not "working" to remediate its material weaknesses over internal controls, but instead perpetuating them. Further, the statements were misleading for omitting to disclose that Oasmia violated the Recording, Access, Approval, and Bookkeeping Provisions, all of which are requirements of internal controls.

380.    The 2017 20-F also included E&Y's report on Oasmia's financial statements for the year ended April 30, 2018 ("2018 Audit Report"), which provided in relevant part:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Oasmia Pharmaceutical AB

We have audited the accompanying consolidated statements of financial position of Oasmia Pharmaceutical AB as of April 30, 2018, 2017 and 2016, and the related consolidated statements of income, comprehensive income, changes in equity and cash flows for each of the three years in the period ended April 30, 2018.[]

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance

- 83 -

about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances[] We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Oasmia Pharmaceutical AB at April 30, 2016, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended April 30, 2016, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board**.**

[]


/s/ Ernst & Young AB
Ernst & Young AB

381.     This statement was false and misleading because as set out in ¶¶133-175, above:

(1) E&Y was reckless in not knowing that Oasmia's financial statements contained numerous false and misleading statements, (2) E&Y's audit did not comport with PCAOB Standards, and (3) E&Y had not taken Oasmia's poor internal controls into account in designing audit procedures.

382.     Defendants Asp and Blom also both filed SOX certifications, which stated in relevant part:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures [...] for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

383.    The statements were false because: (a) as set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, above, the 2018 20-F and its financial statements contained numerous false statements; (b) as set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, Defendants had not designed internal controls or disclosure controls that met the standards set out in their certification, in that the internal controls allowed Defendants to abscond with the Company's cash every single month

and skim interest thereon, failed to ensure that transactions were properly recorded, and failed to ensure that the basis of the Board's actions was properly recorded, among other things; and (c) the Defendants did not disclose to Oasmia's audit committee and/or auditor the frauds set out in ¶¶ 47-77, 79-94, 96-113, and 115-126, above.

384.    On November 1, 2018, Oasmia announced the completion of a private placement of convertible bonds ("November 2018 Bond 6-K").

385.    Defendant Blom signed the November 2018 Bond 6-K.

386.    The November 2018 Bond 6-K provided, in relevant part:

> [T]he Company has completed a private placement of a convertible loan in the total amount of SEK 80,000,000 with an interest rate of 5 per cent per year directed to and placed with a limited group of investors and paid in cash (the "Private Placement"). The convertible instrument issue is expected to provide the Company with SEK 80,000,000 before transaction related costs. Meanwhile, the Company informs that the Board of Directors of Oasmia has issued and allotted 25,806,451 new shares by virtue of utilisation of warrants of series 2018/2019.

> The Private Placement has enabled Oasmia to place 40 new convertible instruments with a limited group of investors at a nominal value of SEK 2,000,000 per convertible instrument through an accelerated book building procedure.

> . . .

> In order to enable the placement, the Board of Directors of Oasmia has, by virtue of the authorisation granted by the Annual General Meeting held on 25 September, 2018, resolved on a directed issue of a new convertible loan in the amount of SEK 80,000,000. The convertible instruments have been subscribed at 100 per cent of the nominal amount and the convertible loan bear an interest rate of 5 per cent per year. The conversion rate is based on the closing price of Oasmia's shares on Nasdaq Stockholm on 31 October 2018 with premium and will amount to SEK 14.50. The term of the loan is approximately one year with a maturity date on 31 October 2019 if not converted to shares earlier. The terms of the convertible instruments are based on an accelerated book building procedure on 31 October 2018 and the Board of Directors has thereby ensured that the terms of the convertible instruments corresponds to fair market standards.

387.     This statement, as well as several others describing issuances of convertible loans, were misleading because, as set out in ¶¶ 115-126, above: (a) they omitted to disclose that a portion of the convertible loans had not been and would not be paid for unless and until it was substantially in the money; (b) in economic substance, the convertible bonds were not debt instruments but warrant awards to Aleksov and Cederstrand. The statements were further misleading for referring to the transaction in the past tense, when in truth the transaction would only be completed if and when the purchasers decided to exercise their "convertible bonds" because Oasmia's stock price exceeded the exercise price.

388.     On November 30, 2018, Oasmia filed with the SEC its interim report for the quarter ended October 31, 2018 ("Q2 2019 6-K").

389.     Defendant Asp signed the Q2 2019 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, Langö, and Asp attested to the Q2 2019 6-K's accuracy.

390.     The 2Q 2019 6-K provided, in relevant part:

> Unutilized credit facilities at the end of the period amounted to TSEK 5,000 with a bank compared to TSEK 5,000 at the end of the corresponding period the previous year and TSEK 40,000 with one of the principal owners, Alceco International S.A., compared to TSEK 40,000 at the end of the corresponding period the previous year.

> At October 31, 2018, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 at the end of the second quarter the previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of October 31, 2018, it was completely unutilized, which was also the case as of October 31, 2017.

391.     These statements were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

392.    The 2Q 2019 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above.

393.    On March 1, 2019, Oasmia filed with the SEC its interim report for the quarter ended January 31, 2019 ("Q3 2019 6-K").

394.    Defendant Asp signed the Q3 2019 6-K. Defendants Aleksov, Cederstrand, Kotsinas, Bergkvist, Langö, and Asp attested to the Q3 2019 6-K's accuracy.

395.    The Q3 2019 6-K provided, in relevant part:

> Unutilized credit facilities at the end of the period amounted to TSEK 5,000 with a bank compared to TSEK 5,000 at the end of the corresponding period the previous year and TSEK 40,000 with one of the principal owners, Alceco International S.A., compared to TSEK 40,000 at the end of the corresponding period the previous year.
>
> At January 31, 2019, Oasmia had a credit facility of TSEK 40,000, compared to TSEK 40,000 at the end of the third quarter the previous year, provided by one of the company's largest shareholders, Alceco International S.A. The interest rate on utilized credit is 5 percent. As of January 31, 2019, it was completely unutilized, which was also the case as of January 31, 2018.

396.    These statements and others like them were misleading because, for the reasons set out in ¶¶ 96-113, above, they failed to disclose that Alceco had no ability to lend any money to Oasmia and thus the credit facility was worthless.

397.    The Q3 2019 6-K, as required by both IFRS and SEC regulations, also purported to disclose all related party transactions. The statement was misleading because it omitted to disclose the Cash Sweeps, as set out in ¶¶ 47-77, above.

## X.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

398.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants

- 88 -

who acquired Oasmia ADSs publicly traded on the Nasdaq during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Oasmia, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

399.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Oasmia securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

400.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

401.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

402.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Oasmia;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Oasmia to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of Oasmia's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

403.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

404.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Oasmia ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

- As a public issuer, Oasmia filed periodic public reports with the SEC;

- Oasmia regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- On average, 6.7% of the total number Oasmia's ADSs traded every week, permitting a ***very strong*** presumption of efficiency.

- Oasmia was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available;

- At least 20 firms made a market in Oasmia's ADSs; and

- New company-specific information was rapidly reflected in Oasmia's stock price; and

- Oasmia met the requirements for filing, and did file, a Registration Statement on Form F-3.

405.   Based on the foregoing, the market for Oasmia ADSs promptly digested current information regarding Oasmia from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

406.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against Oasmia and the Individual Defendants

407.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

408.   This Count is asserted against Oasmia and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

409.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

410.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Oasmia securities during the Class Period.

411.    Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Oasmia were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Oasmia, their control over, and/or receipt and/or modification of Oasmia's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Oasmia, participated in the fraudulent scheme alleged herein.

412.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and

- 92 -

disclose the true facts in the statements made by them or other Oasmia personnel to members of the investing public, including Plaintiffs and the Class.

413.    As a result of the foregoing, the market price of Oasmia securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Oasmia securities during the Class Period in purchasing Oasmia securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

414.    Had Plaintiffs and the other members of the Class been aware that the market price of Oasmia securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Oasmia securities at the artificially inflated prices that they did, or at all.

415.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

416.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Oasmia securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

417.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

418.    During the Class Period, the Individual Defendants participated in the operation and management of Oasmia, and conducted and participated, directly and indirectly, in the conduct of Oasmia's business affairs. Because of their senior positions, they knew the adverse

non-public information about Oasmia's misstatement of revenue and profit and false financial statements.

419.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Oasmia's financial condition and results of operations, and to correct promptly any public statements issued by Oasmia which had become materially false or misleading.

420.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Oasmia's disseminated in the marketplace during the Class Period concerning Oasmia's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Oasmia to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Oasmia within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Oasmia securities.

421.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Oasmia.

## COUNT III

### VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AGAINST DEFENDANT E&Y

422.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

423.    This cause of action is asserted against E&Y.

424.    During the Class Period, E&Y carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public,

- 94 -

including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Oasmia securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, E&Y issued knowingly false audit reports during the Class Period. E&Y's accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

425.    E&Y, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the true financial condition or Oasmia and conceal adverse material information about the business, operations and future prospects of Oasmia as specified herein.

426.    E&Y employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Oasmia's value, performance and continued substantial growth, as well as the absence of contingent tax liabilities, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Oasmia and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Oasmia securities during the Class Period.

427.    E&Y had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that failed to ascertain and

to disclose such facts, even though such facts were available to them. E&Y's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Oasmia's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by E&Y's false and misleading statements during the Class Period, E&Y, if it did not have actual knowledge of the misrepresentations and omissions alleged, was highly reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

428.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Oasmia's securities was artificially inflated during the Class Period.

429.    In ignorance of the fact that market prices of Oasmia's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which Oasmia's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired Oasmia securities during the Class Period at artificially high prices and were damaged thereby.

430.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Oasmia's financial results and condition, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Oasmia securities, or, if they had acquired such securities during the Class

Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

431.    By virtue of the foregoing, E&Y has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

432.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Oasmia's securities during the Class Period.

433.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

010837-11/1209285 V1

Dated: November 14, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Jonathan Horne
Jonathan Horne (JH 7258)
Phillip Kim (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
Email: jhorne@rosenlegal.com
          pkim@rosenlegal.com

*Co-Lead Counsel for Movants and [Proposed] Co-Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

JASON A. ZWEIG, JZ-8107
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
jasonz@hbsslaw.com

Reed R. Kathrein (*pro hac vice* pending)
Danielle Smith (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com

010837-11/1209285 V1